# 21-2245-cv(L), 21-2247-cv(CON)

# United States Court of Appeals

*for the*

# Second Circuit

RECEIVER JED HORWITT, ESQ.,

*Receiver-Appellee,*

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

– v. –

FLATIRON PARTNERS, LP, NEILA FORTINO,

*Claimants-Appellants,*

MARK J. VARACCHI, SENTINEL GROWTH FUND MANAGEMENT LLC,
RADAR ALTERNATIVE FUND LP, RELIEF DEFENDANT, RADAR
ALTERNATIVE MASTER FUND SPC, RELIEF DEFENDANT,

*Defendants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## BRIEF FOR CLAIMANT-APPELLANT
## FLATIRON PARTNERS, LP

THERESA TRZASKOMA
NOAM BIALE
CATHY LIU
SHER TREMONTE LLP
*Attorneys for Claimant-Appellant*
 *Flatiron Partners, LP*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

**<u>TABLE OF CONTENTS</u>**

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

PRELIMINARY STATEMENT ...............................................................1

STATEMENT OF JURISDICTION...........................................................2

STATEMENT OF THE CASE...................................................................3

I.    Factual Background .......................................................................3

    A.    The Ponzi Scheme ...............................................................3

    B.    Flatiron Invests in Radar .....................................................5

    C.    Radar Temporarily Refunds $2 million to Flatiron .............6

    D.    Flatiron Sustains Devastating Losses Due to the Fraud.......7

II.   Procedural History .........................................................................8

STANDARD OF REVIEW .......................................................................14

SUMMARY OF ARGUMENT .................................................................15

ARGUMENT ...........................................................................................16

I.    The District Court Failed to Apply Principles of Equity in Its
    Calculation of Flatiron's Pre-Receivership Recovery Percentage ...............16

    A.    The Order Is Inequitable Because the District Court Did Not
        Take into Account the Undisputed Facts or Reflect Economic
        Reality...................................................................................19

    B.    The District Court's Calculation Undermines the Equity-Based
        Objectives of the Rising Tide Method .................................23

    C.    The District Court's Calculation Method Is Inequitable Because
        It Punishes Flatiron for Being Defrauded by Defendants ...................26

II.    The District Court's Calculation Relied on Clearly Erroneous Factual Findings ........................................................................................29

III.   Flatiron Is Seeking Narrow Relief.................................................32

CONCLUSION ........................................................................................34

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Anderson v. City of Bessemer City, N.C.*,
    470 U.S. 564 (1985)...................................................................................29

*Baggett v. Bullitt,*
    377 U.S. 360 (1964)...................................................................................17

*Commodity Futures Trading Comm'n v. Walsh*,
    712 F.3d 735 (2d Cir. 2013) .........................................................................21

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384 (1990)...................................................................................29

*Gallego v. Northland Grp. Inc.*,
    814 F.3d 123 (2d Cir. 2016) .........................................................................15

*Hazel–Atlas Glass Co. v. Hartford–Empire Co.,*
    322 U.S. 238 (1944)...................................................................................17

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944).......................................................................... 16, 17

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc*.,
    572 U.S. 559 (2014)...................................................................................29

*Holland v. Florida*,
    560 U.S. 631 (2010)...................................................................................17

*Holmberg v. Armbrecht,*
    327 U.S. 392 (1946)...................................................................................17

*Lonchar v. Thomas,*
    517 U.S. 314 (1996)...................................................................................16

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010) ..........................................................................15

*S.E.C. v. Alleca*,
    No. 1:12-cv-3261-WSD, 2017 WL 4174217 (N.D. Ga. Sept. 21, 2017)18, 24

*S.E.C. v. Basic Energy & Affiliated Res., Inc.*,
    273 F.3d 657 (6th Cir. 2001) ...........................................................................3

*S.E.C. v. Byers*,
    637 F. Supp. 2d 166 (S.D.N.Y. 2009) ............................................... 17, 18, 22

*S.E.C. v. Callahan*,
    193 F. Supp. 3d 177 (E.D.N.Y. 2016) ...........................................................23

*S.E.C. v. Capital Consultants LLC*,
    453 F.3d 1166 (9th Cir. 2006) (per curiam ....................................................3

*S.E.C. v. Certain Unknown Purchasers of Common Stock of & Call Options for Common Stock of Santa Fe Int'l Corp.*,
    817 F.2d 1018 (2d Cir. 1987) ........................................................................16

*S.E.C. v. Coadum Advisors, Inc.*,
    No. 1:08-cv-11-ODE, 2009 WL 10664889 (N.D. Ga. Sept. 24, 2009) . 18, 28

*S.E.C. v. Credit Bancorp, Ltd.*,
    290 F.3d 80 (2d Cir. 2002) .......................................................................3, 14

*S.E.C. v. Enter. Trust Co.*,
    No. 08-cv-1260, 2008 WL 4534154 (N.D. Ill. Oct. 7, 2008)........................18

*S.E.C. v. Forex Asset Mgmt. LLC*,
    242 F.3d 325 (5th Cir. 2001) ............................................................... 2, 3, 16

*S.E.C. v. Huber*,
    702 F.3d 903 (7th Cir. 2012) ....................................................... 20, 21, 22, 23

*S.E.C. v. Malek*,
    397 F. App'x 711 (2d Cir. 2010) ...................................................................16

iv

*S.E.C. v. Manor Nursing Centers, Inc.*,
  458 F.2d 1082 (2d Cir. 1972) ........................................................................16

*S.E.C. v. Morgan*,
  No. 1:19-cv-00661-EAW, 2020 WL 6536894 (W.D.N.Y. Nov. 6, 2020)....21

*S.E.C. v. Orgel*,
  407 F. App'x 504 (2d Cir. 2010) ....................................................................2

*S.E.C. v. Parish*,
  No. 2:07-cv-00919-DCN, 2010 WL 5394736 (D.S.C. Feb. 10, 2010) .........23

*S.E.C. v. Torchia*,
  922 F.3d 1307 (11th Cir. 2019) ......................................................................3

*S.E.C. v. Wang*,
  944 F.2d 80 (2d Cir. 1991) ...........................................................................17

*S.E.C. v. Wealth Mgmt. LLC*,
  628 F.3d 323 (7th Cir. 2010) ...................................................................3, 21

*U.S. Commodity Futures Trading Comm'n v. Barki, LLC*,
  No. 3:09-cv-106-MU, 2009 WL 3839389 (W.D.N.C. Nov. 12, 2009) .........22

*U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*,
  No. 07-cv-3598, 2010 WL 960362 (N.D. Ill. Mar. 15, 2010) ......................24

*U.S. Commodity Futures Trading Comm'n v. Wilson*,
  No. 11-cv-1651-GPC-BLM, 2013 WL 3776902 (S.D. Cal. July 17, 2013) 19, 23

*United States v. Noland*,
  517 U.S. 535 (1996)......................................................................................18

## Statutes

15 U.S.C. § 78aa (1982).................................................................................16

28 U.S.C. § 1292(a)(1)................................................................................2, 3

28 U.S.C. § 1331 ......................................................................................2

## PRELIMINARY STATEMENT

Appellant Flatiron Partners, LP ("Flatiron") appeals from an order of the district court (Hon. Victor A. Bolden, *Judge*) approving a distribution plan proposed by Receiver Jed Horowitz, Esq. The district court erred in holding that Flatiron's pre-receivership percentage recovery for purposes of the Rising Tide method was 43.06%, rather than 20.74%. As a practical matter, the district court's decision means that Flatiron will recover nothing despite being one of the largest victims of the defendants' Ponzi scheme. The district court's error constitutes an abuse of discretion because, as a court sitting in equity, it was obligated to consider the fairness of the Receiver's proposed distribution plan based on the particular facts of this case and apply any methodology flexibly, not rigidly. The district court's assessment of the facts was also clearly erroneous, as the court ignored undisputed facts and inflated Flatiron's contribution to and recovery from the Ponzi scheme by $2 million on both sides of the ledger. These errors have severely disadvantaged Flatiron as compared with other claimants. The district court accordingly failed in its duty to do equity and abused its discretion. Consequently, this Court should vacate the district court's order and remand with instructions to calculate Flatiron's pre-receivership recovery percentage correctly and equitably.

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. The district court issued its order granting the Receiver's motion for renewed determination of claims on July 30, 2021 (the "Order"). SPA 1-27.[1] Flatiron timely appealed on September 17, 2021. JA 985-86. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because the Order modified the district court's previous order issuing a preliminary injunction, freezing assets, and granting other equitable relief. JA 4 (Dkt. # 7). *See S.E.C. v. Orgel*, 407 F. App'x 504, 505 (2d Cir. 2010) (summary order).

Alternatively, this Court has jurisdiction under the collateral order doctrine because: (1) the district court's adoption of the Receiver's distribution plan conclusively determines the manner in which the receivership assets should be distributed; (2) the Order resolves an important issue regarding the distribution of receivership assets, which is wholly separate from the merits of the Securities and Exchange Commission's ("SEC") complaint against the defendants; and (3) the Order is effectively unreviewable because the assets will be distributed to other claimants and therefore unrecoverable by the time the SEC action is subject to appellate review. *See S.E.C. v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 330 (5th

---

[1] The Special Appendix is referenced herein as "SPA." The Joint Appendix is referenced as "JA."

Cir. 2001). Although this Court has not had occasion to decide whether the collateral order doctrine applies to orders approving a receiver's distribution plan, *see S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 86 (2d Cir. 2002) (declining to decide because jurisdiction was proper under 28 U.S.C. § 1292(a)(1)), numerous other circuits have held that the collateral order doctrine applies to such orders. *See S.E.C. v. Torchia*, 922 F.3d 1307, 1315 (11th Cir. 2019); *S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d 323, 330-31 (7th Cir. 2010); *Forex Asset Mgmt.*, 242 F.3d at 330-31; *S.E.C. v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 666-67 (6th Cir. 2001); *but see S.E.C. v. Capital Consultants LLC*, 453 F.3d 1166, 1171-72 (9th Cir. 2006) (per curiam).

## STATEMENT OF THE CASE

### I. Factual Background

#### A. The Ponzi Scheme

Between 2015 and 2016, Mark Varacchi and Sentinel Growth Fund Management, LLC ("Sentinel") (together, "Defendants") operated a Ponzi scheme that defrauded more than two dozen investors and investment managers of over $25 million. JA 24-25, 175. Flatiron was among the Ponzi scheme's victims and lost approximately $4,014,992.62, which accounts for nearly 16% of the total claimed losses stemming from the scheme. JA 163, 175.

3

In addition to Sentinel, Varacchi used a private fund called Radar LP (also known as Radar SPC) ("Radar"), which operated a syndicate trading platform. JA 27-28, 121. Varacchi promoted Radar to prospective investors as an opportunity to invest with "up-and-coming" investment managers who traded on the platform. JA 27-28, 123. Radar contained multiple series, or subaccounts, that were managed by investment managers. JA 27. In addition to soliciting investors, Varacchi also recruited investment managers. JA 28, 397. Varacchi promised that their investments would be allocated to certain series of the fund, and they would have access to and exclusive control over the trading in segregated subaccounts. *Id.* Accordingly, some investment managers, like Flatiron's, agreed to transfer their and their clients' assets to Radar. *Id.*

Upon receiving the investments, however, Varacchi did not place the funds in any segregated subaccounts. JA 29-31, 399. Instead, he commingled these investments with other funds and misappropriated them. *Id.* Varacchi used the commingled funds to pay prior investors who sought redemptions and also used the funds to cover his own personal or business expenses. *Id.* Varacchi took various measures to conceal the scheme. JA 31-32. For instance, he misrepresented the status of monthly performance to investors and compensated for diverted funds through margin borrowing. *Id.*

4

B.    Flatiron Invests in Radar

With losses of over $4 million, which account for 15.94% of the total claimed losses, Flatiron is one of the largest victims of Defendants' scheme. JA 175. Flatiron was an investment fund managed by Flatiron Partners LLC ("FPLLC") and its sole member and principal, Brett Crawford. JA 396. Flatiron managed approximately twenty-one investment accounts, representing thirty-seven individual investors, who had an average account balance of $174,205. *Id.* All of Flatiron's investors were Crawford's friends and family, including his parents. *Id.* Crawford, who invested more than $1.3 million of his own money into the fund, was Flatiron's largest investor. JA 397.

In mid-2014, Crawford and Varacchi began having discussions about Flatiron potentially transferring its assets to Radar's trading platform. *Id.* Varacchi represented that Flatiron would benefit from the platform because, among other reasons, it offered cost-effective trading as well as operations support. *Id.* Varacchi assured Crawford that Flatiron's assets would be maintained in a segregated subaccount and that Flatiron would receive monthly account statements and NAV calculations. *Id.*

In reliance on these representations, Crawford agreed to move Flatiron's assets to Radar. *Id.* On January 15, 2015, Crawford wired $2 million to Radar on behalf of Flatiron. *Id.*

C.     <u>Radar Temporarily Refunds $2 million to Flatiron</u>

When Crawford transferred Flatiron's assets to Radar, he was misled to believe that the assets would be placed in a segregated subaccount and that he could begin trading immediately. *Id.* However, Crawford experienced significant delays in receiving subaccount access. *Id.* Unbeknownst to Crawford, the cause of these delays was Varacchi's fraud. After receiving Flatiron's assets, Varacchi did not place them in a segregated subaccount, as promised. JA 735-36, 807-10. Instead, on January 27, 2015, Varacchi misappropriated the funds to pay another investor and for Varacchi's personal investments. *Id.* Varacchi provided vague explanations for the delay, falsely telling Crawford that the subaccount was not ready for trading because of administrative issues that would soon be resolved. JA 397, 765.

On January 21, 2015, Flatiron's fund administrator wrote to Crawford and requested subaccount access so that it could perform the fund's NAV calculation for January. JA 797. In response, Crawford explained that, despite Varacchi's promises, the subaccount had not been set up yet. *Id.* On February 5, 2015, after the fund administrator again requested access to the subaccount, Crawford requested an account statement from Varacchi. JA 796. Varacchi responded that Flatiron would receive "segregated account access by early next week" and that he would be able to provide a statement at that time. JA 795.

On February 13, 2015, the fund administrator inquired again about access to the subaccount. *Id.* Crawford explained that because the subaccount was still unavailable, he would ask Varacchi to wire the funds back temporarily so the NAV calculation could be performed. *Id.* A few days later, Crawford asked Varacchi to temporarily refund Flatiron's initial $2 million investment so that the fund administrator could calculate the NAV. JA 774.

On February 26, 2015, Varacchi wired $2 million back to Flatiron. JA 398, 736, 774, 778. It is undisputed that this transfer was only a temporary refund, and that Flatiron intended to and did return the investment once the NAV calculation was complete. *Id.* Indeed, just a few days later, on March 2, 2015, Flatiron returned the funds to Radar. *Id.*

D.    Flatiron Sustains Devastating Losses Due to the Fraud

Flatiron commenced trading on the Radar platform on March 3, 2015. JA 398. From March 2015 to December 2016, Flatiron invested an additional $3.1 million into its subaccount and made trades daily. JA 399. In late December 2016, Crawford was informed that trading had been suspended. *Id.* When the SEC filed suit, Crawford learned that Varacchi had operated a Ponzi scheme and that Flatiron's assets had not been kept in a segregated subaccount as Crawford had been promised and as he had believed, but rather the funds had been commingled and misappropriated by Varacchi. *Id.*

7

Ultimately, Flatiron invested $5,100,921 in Radar. *Id.* Of the $5,100,921 contribution, Flatiron received only $1,057,931 in return before the scheme collapsed. *Id.* Thus, Flatiron lost approximately $4,014,992.62 and has not recovered any of this amount since the fraud was discovered. JA 163, 399.

## II.    **Procedural History**

On February 2, 2017, the SEC initiated an enforcement action against Defendants, alleging that Varacchi had misappropriated investor assets to perpetrate a Ponzi scheme. JA 24-39. On May 1, 2017, the district court appointed Jed Horowitz, Esq. as the Receiver of the "Receivership Estate," defined as "all property of whatever kind of Sentinel and [Radar]." JA 42-43.

By July 2018, a total of thirty-three victims, including Flatiron, submitted timely Proofs of Claim to the Receiver. JA 117. Through written consent, Flatiron and the Receiver agreed that Flatiron's claim against the Receivership Estate was $4,014,992.62, which represented Flatiron's total loss of principal from the scheme. JA 125, 163. By July 12, 2018, the Receiver also resolved the appropriate amounts of claims with twenty-six other claimants, leaving only six claims unresolved. JA 134-35. The Receiver intended to make an initial distribution of $3,100,000 to those claimants with resolved claims. JA 155. Accordingly, the Receiver filed a motion seeking a court order: (1) authorizing the consolidation of all assets in the Receivership Estate into a single fund for distribution on a *pro rata* basis; (2)

8

allowing the twenty-seven claimants with resolved claims to receive initial distributions to the extent appropriate under the distribution plan; and (3) approving the Receiver's proposed plan of distribution. JA 112-157.

The Receiver proposed distributing the Receivership Estate pursuant to the Rising Tide method, which he described as the "most equitable distribution method" among available alternatives. JA 144-47. Under the Rising Tide method, a Ponzi scheme victim who recovered funds before the scheme's collapse would be skipped over in distribution rounds until all investors who received nothing, or a smaller recovery percentage, had recovered to the same extent. *Id*. The Receiver provided his calculation of the pre-receivership recovery percentage for each claimant. JA 175. As to Flatiron, the Receiver determined that the recovery percentage was 43.1%, based on his finding that Flatiron made $7,100,921 in capital contributions, not $5,100,921, and received $3,057,931 in pre-receivership distributions, not $1,057,931. *Id.* The difference between Flatiron's and the Receiver's calculations was $2 million on each side – the amount that made the roundtrip in late February and early March of 2015 to calculate Flatiron's NAV.

On July 20, 2018, Flatiron sent a letter to the Receiver concerning the proposed plan of distribution. JA 340-42. Flatiron did not object to the use of the Rising Tide method, but rather argued that the Receiver had miscalculated Flatiron's pre-receivership recovery percentage under that method. JA 340. Specifically,

Flatiron maintained that the Receiver's calculation incorrectly "double-counted Flatiron's first contribution of $2 million and mistakenly treated the temporary $2 million refund as a distribution." JA 341. With respect to the February 26, 2015 withdrawal, Flatiron argued that this transaction should not have been treated as a distribution because it was merely a temporary refund. JA 340. Flatiron emphasized that the money was wired back to Radar immediately thereafter, as intended. *Id.* In light of this context, Flatiron pointed out that the $2 million transfers into Radar on January 15, 2015 and March 2, 2015 should not have been treated as two separate investments, because they were in fact "two attempts to make a single investment." JA 341. Accordingly, Flatiron requested that the Receiver modify his calculation to reflect the economic reality that Flatiron recovered only 20.74% of its investment, based on its capital contributions of $5,100,921 and pre-receivership distributions of $1,057,931. *Id.* None of the other claimants filed any objection to Flatiron's request that its pre-receivership recovery percentage be recalculated. *See* JA 1-23.

On October 4, 2018, the district court entered an order approving the Rising Tide method of distribution and the other relief requested in the Receiver's July 12, 2018 motion.[2] JA 190-99. On July 19, 2019, the Receiver filed his initial Motion for

---

[2] On October 5, 2018, the Receiver filed a supplement to the July 12, 2018 motion informing the court that he had received a Limited Objection from Flatiron regarding his calculation of Flatiron's pre-receivership recovery percentage. JA 217-24. The Receiver explained that Flatiron's objection would only affect *future* interim

Determination of Claim Held by Flatiron. JA 319-37. Notwithstanding the context provided in Flatiron's July 20, 2018 letter, the Receiver maintained that both transfers of the $2 million, as well as the withdrawal, should be considered in the recovery percentage calculation. JA 320. The Receiver asserted that Flatiron's explanation that the withdrawal was caused by delays in the trading platform was "materially incomplete." JA 333. The Receiver questioned the purpose of the return of funds, arguing that "[i]t appear[ed] from emails that Flatiron actually engaged in some trading activity in January[] 2015, and Flatiron actually received from Sentinel $22,132.45 on February 20, 2015 (apparently in trading 'profits' or 'fees')." *Id.*

On August 23, 2019, Flatiron submitted a formal Limited Objection to the Receiver's motion and attached the declaration of Crawford, whose sworn statement supported the facts presented in the Limited Objection. JA 376-99. Specifically, Crawford averred that: (1) in mid-February 2015, Flatiron's fund administrator asked him to request a refund of the initial investment so that it could calculate Flatiron's monthly NAV; (2) "from January 15, 2015 to February 26, 2015 - Flatiron made no actual trades and received no trading profits;" and (3) the separate payment of $22,132.45 from Sentinel to FPLLC "had nothing to do with Flatiron and did not represent a withdrawal or a return on investment for Flatiron or any of its investors."

---

distributions and, therefore, would not alter the relief granted by the court's order regarding the initial distribution. JA 220.

JA 396-99. In its Limited Objection, Flatiron clarified that it was not objecting to "the Rising Tide method *per se*," but was only objecting to "the Receiver's calculation of Flatiron's pre-receivership percentage of recovery." JA 380.

On December 12, 2019, the Receiver sought leave to conduct discovery to investigate the facts presented in the Limited Objection and Crawford's declaration. JA 400-09. Flatiron objected to discovery on the grounds that the Receiver was in full possession of all relevant information, that there was no basis to dispute Crawford's account of events, and that discovery was not warranted, but on March 20, 2020, the district court granted the Receiver's request for discovery. JA 423-26, 501-12. The district court denied the Receiver's Motion for Determination of Claim without prejudice to renew at the close of discovery. JA 501-12. On September 30, 2020, the Receiver completed discovery, which included document production and a deposition of Crawford. JA 515, 732.

Although the discovery substantiated the account provided in Crawford's declaration, on January 15, 2021, the Receiver filed a Renewed Motion to Determine the Claim of Flatiron, again asking the court to find that Flatiron's pre-receivership recovery percentage was 43.06%. JA 723-24, 726-44. The Receiver conceded that after the initial $2 million transfer, Varacchi could not provide the fund administrator with an "account statement or other written verification establishing that Flatiron's funds were held in a segregated account" because a segregated account did not exist.

12

JA 734. The Receiver also attached email correspondence obtained in discovery establishing that Crawford had requested the $2 million refund temporarily so the fund administrator could complete the NAV calculation. JA 795-98. On March 5, 2021, Flatiron filed its objection to the motion on the same grounds as its previous objection, again noting that it was not objecting to the Rising Tide method. JA 923-35.[3]

On July 30, 2021, the district court issued the Order, granting the Receiver's motion, concluding "that the pre-receivership recovery percentage realized by Flatiron under the Rising Tide method is 43.06%." SPA 27. In the Order, the district court noted that after Flatiron's transfer of its initial investment, Varacchi wired $2 million from Radar's bank account to Sentinel's account. SPA 6. It further noted that Flatiron's money was used to pay another investor and to make certain private equity investments. *Id.* The court acknowledged that Crawford told his fund administrator, who needed access to complete the NAV calculation, that he would ask Varacchi "to wire the money back next week" because he had not received account access. *Id.* The court also found that on February 26, 2015, Varacchi refunded Flatiron the initial investment, and that this same amount was returned to Radar on March 2, 2015. SPA 8. In other words, the court confirmed Flatiron's version of events.

---

[3]     On March 19, 2021, the Receiver filed a reply, JA 953-59, and on July 22, 2021, the district court held oral argument on the motion. JA 964.

Nevertheless, the district court declined to adjust Flatiron's pre-receivership recovery percentage by excluding the initial $2 million roundtrip transaction from the calculation. First, the district court noted that the money Flatiron received in February 2015 was not Flatiron's original investment, but funds misappropriated from other investors. SPA 24. Second, the district court concluded that adjusting Flatiron's recovery percentage would amount to "apply[ing] an entirely different distribution methodology," SPA 25-26, and that applying this new method would create "various adjustments to multiple creditors' pre-receivership recovery." SPA 26. Third, the district court held that Flatiron had not adequately demonstrated how Flatiron's "failure to recover" or "reduction in its recovery" renders the Receiver's calculation inequitable. *Id.*

On September 17, 2021, Flatiron filed a timely notice of appeal of the district court's ruling. JA 985-86.

## STANDARD OF REVIEW

An appellate court "review[s] the District Court's decision relating to the choice of distribution plan for the receivership estate for abuse of discretion." *S.E.C. v. Credit Bancorp, Ltd.,* 290 F.3d 80, 87 (2d Cir. 2002). A district court abuses its discretion when its "decision rests on an error of law or a clearly erroneous factual finding, or its decision cannot be located within the range of permissible decisions."

*Gallego v. Northland Grp. Inc.*, 814 F.3d 123, 129 (2d Cir. 2016) (quoting *Myers v. Hertz Corp.,* 624 F.3d 537, 547 (2d Cir. 2010) (internal quotation marks omitted)).

## SUMMARY OF ARGUMENT

A district court's equity jurisdiction is defined by its flexibility, rather than its rigidity. That flexibility allows – and indeed requires – the court to examine the particular facts to ensure that any distribution plan is being applied equitably. The district court here erred in rigidly applying the Rising Tide method without regard to the particular facts and circumstances of Flatiron's claim and in a manner that created unfairness. And the district court compounded its error by misconstruing Flatiron's request that the method be applied equitably – that is, *with* regard to those particular facts – as a demand to apply a wholly different methodology to its claims. In so doing, the district court both erred as a matter of law – in failing to exercise its equitable jurisdiction and instead deferring to the Receiver's rigid application of the Rising Tide method – and made a clearly erroneous finding of fact – in adopting the Receiver's contention that the temporary refund of the $2 million was, in fact, a return of $2 million followed by a separate, additional $2 million investment. On both grounds, the district court abused its discretion and accordingly this Court should vacate the district court's Order.

**ARGUMENT**

I.    **The District Court Failed to Apply Principles of Equity in Its Calculation of Flatiron's Pre-Receivership Recovery Percentage**

"Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa (1982), confers general equity powers on district courts to remedy violations of the Act." *S.E.C. v. Certain Unknown Purchasers of Common Stock of & Call Options for Common Stock of Santa Fe Int'l Corp.*, 817 F.2d 1018, 1020 (2d Cir. 1987). "Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy." *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972). Thus, a district court reviewing a receivership proceeding on behalf of victims of a Ponzi scheme functions as a court sitting in equity. *See S.E.C. v. Malek*, 397 F. App'x 711, 713 (2d Cir. 2010) (summary order) (noting that "a federal receiver is appointed" pursuant to a district court's "equitable discretion"); *accord Forex Asset Mgmt. LLC*, 242 F.3d at 331 (noting that a district court's approval of a receiver's distribution plan is "pursuant to its inherent equitable powers" (internal quotation marks omitted)).

"The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). While courts of equity are "governed by rules and precedents no less than the courts of law," *Lonchar v. Thomas,* 517 U.S.

16

314, 323 (1996) (internal quotation marks omitted), the Supreme Court has "made clear that often the 'exercise of a court's equity powers must be made on a case-by-case basis.'" *Holland v. Florida*, 560 U.S. 631, 649-50 (2010) (quoting *Baggett v. Bullitt,* 377 U.S. 360, 375 (1964) (alteration omitted)). In emphasizing the need for "flexibility" and avoiding "mechanical rules," *Holmberg v. Armbrecht,* 327 U.S. 392, 396 (1946), the Court has "followed a tradition in which courts of equity have sought to 'relieve hardships which, from time to time, arise from a hard and fast adherence' to more absolute legal rules, which, if strictly applied, 'threaten the evils of archaic rigidity.'" *Holland*, 560 U.S. at 650 (quoting *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 248 (1944)). "The flexibility inherent in equitable procedure enables courts to meet new situations that demand equitable intervention, and to accord all the relief necessary to correct particular injustices." *Id.* (internal quotation marks and alterations omitted). In sum, "[f]lexibility rather than rigidity has distinguished" equity from law. *Hecht Co.*, 321 U.S. at 329.

In the context of a district court applying its equity jurisdiction to evaluate a receiver's distribution plan, the court must ensure that the plan is fair and reasonable. *See S.E.C. v. Wang*, 944 F.2d 80, 81 (2d Cir. 1991) (noting that a plan of distribution is reviewed under a "court's general equitable powers to ensure that it is fair and reasonable."); *S.E.C. v. Byers*, 637 F. Supp. 2d 166, 168 (S.D.N.Y. 2009) (Chin, J.)

("As a District Court sitting in equity, it is my responsibility to approve a distribution plan only if it is fair and reasonable."). "The standard is whether a distribution is equitable and fair in the eyes of a reasonable judge." *Id.* (quoting *S.E.C. v. Enter. Trust Co.,* No. 08-cv-1260, 2008 WL 4534154, at *3 (N.D. Ill. Oct. 7, 2008)). The judge must, consistent with the principles of equity, be sufficiently flexible to "make exceptions to a general rule when justified by particular facts." *United States v. Noland*, 517 U.S. 535, 540 (1996).

The Rising Tide method advances equity by giving distribution priority to investors who received no pre-receivership withdrawals, so that they can "catch up" to investors who already recovered a portion of their losses and "narrow the gap in total funds recovered." *S.E.C. v. Coadum Advisors, Inc.*, No. 1:08-cv-11-ODE, 2009 WL 10664889, at *6 (N.D. Ga. Sept. 24, 2009). "Once the Receiver's distributions sufficiently narrow that gap, those investors who received the fewest pre-receivership withdrawals may begin to participate in distributions of recovered funds, followed by the investors who received incrementally greater pre-receivership withdrawals than those investors, and so on." *Id.* "The basic goal of the rising tide allocation is to equalize recovery for victims regardless of whether the recovery comes before or after the commencement of the receivership." *S.E.C. v. Alleca*, No. 1:12-cv-3261-WSD, 2017 WL 4174217, at *4 (N.D. Ga. Sept. 21, 2017) (internal quotation marks and alterations omitted). If so applied, courts have found Rising

18

Tide to be "the most equitable approach" of distribution. *U.S. Commodity Futures Trading Comm'n v. Wilson*, No. 11-cv-1651-GPC-BLM, 2013 WL 3776902, at *7 (S.D. Cal. July 17, 2013).

    A.    <u>The Order Is Inequitable Because the District Court Did Not Take into Account the Undisputed Facts or Reflect Economic Reality</u>

The district court found that over the course of the scheme, Flatiron made $7,100,921 in capital contributions and received $3,507,931 in pre-receivership distributions and had therefore recovered 43.06% of its contributions. SPA 21-22, 27. But this calculation of dollars in and dollars out ignores the facts surrounding the temporary refund and the immediate return of the $2 million in February-March 2015. The actual economic reality is that Flatiron made a net investment of $5,100,921 and received $1,057,931 in distributions. JA 399. Accordingly, Flatiron recovered only 20.74% of its total investment.

That economic reality is based on the following undisputed facts: On January 15, 2015, Flatiron transferred $2 million to Radar. JA 397. Between that date and February 26, 2015 Flatiron was unable to trade on the Radar platform. JA 397-98, 790-93. On February 26, 2015, Flatiron received a temporary refund for the sole purpose of calculating Flatiron's NAV, and Flatiron returned the very same funds to Radar just a few days later. JA 398, 795. On March 2, 2015, Flatiron's total initial investment remained $2 million. JA 398. Flatiron began trading on March 3, 2015 and between then and December 2016, Flatiron invested another $3.1 million,

increasing its total investment to $5,100,921. JA 398-99. Of this amount, Flatiron received only $1,057,931 in redemptions before the scheme collapsed. *Id.* Accordingly, Flatiron actually recovered only 20.74% of its total investment.

Ignoring these undisputed facts, however, the district court deferred to the Receiver's rigid application of the Rising Tide method, which mechanically added up the dollars in and dollars out, thereby inflating Flatiron's actual contributions and distributions by $2 million on each side of the ledger. This disadvantaged Flatiron *vis-à-vis* other claimants and is an inequitable application of the Rising Tide method.

In *S.E.C. v. Huber*, 702 F.3d 903, 904 (7th Cir. 2012), the Seventh Circuit, in an opinion by Judge Posner, recognized that when the Rising Tide method is applied rigidly and does not reflect an investor's economic reality, the investor will be prejudiced in the distribution relative to others. The Seventh Circuit provided the following hypothetical as an illustration:

> Suppose [a hypothetical investor] had initially invested $150,000 and then, shortly after withdrawing $50,000, he reinvested it, thus restoring his balance to $150,000, all of which he lost when the scheme collapsed. Under the rising tide method he would be credited with having invested $200,000 ($150,000 plus $50,000) and having recouped a quarter of that amount by his withdrawal, and thus would receive a reduced share of recovered assets compared to a person who had invested $150,000 and lost it without any interim withdrawals. We can't see why those two investors should be treated differently, as would be obvious if the withdrawal and reinvestment had occurred on successive days.

*Id.* at 907.

To prevent this injustice, the Seventh Circuit explained, albeit in *dictum*, that any calculation of pre-receivership recovery for purposes of applying the Rising Tide method should account for the economic reality, stating "[i]n cases of withdrawal followed by reinvestment, the investor's maximum balance in the Ponzi scheme . . . should be treated as his investment; the withdrawals, having in effect been rescinded, should be ignored." *Id.* Thus, *Huber* recognized that a Rising Tide calculation is equitable only to the extent it reflects economic reality. When it does not, some investors will be made worse off as compared to similarly situated claimants, which is incompatible with fairness and equity – the very goal of the Rising Tide method and any distribution plan. *See S.E.C. v. Morgan*, No. 1:19-cv-00661-EAW, 2020 WL 6536894, at *6 (W.D.N.Y. Nov. 6, 2020) ("[A]s a general rule, investors who are 'similarly situated' should be treated consistently in a distribution plan.") (citing *Commodity Futures Trading Comm'n v. Walsh*, 712 F.3d 735, 750 (2d Cir. 2013)); *S.E.C. v. McGinn, Smith & Co.*, No. 1:10-cv-457-GLS-CFH, 2016 WL 6459795, at *3 (N.D.N.Y. Oct. 31, 2016) ("When investors' assets are commingled and the recoverable assets in a receivership are insufficient to fully repay the investors, equality is equity.") (quoting *Wealth Mgmt. LLC*, 628 F. 3d at 333 (internal quotation marks omitted)).

The district court misconstrued this persuasive *dictum* in *Huber* as a demand by Flatiron to have an alternative "maximum balance approach" applied to its claims, rather than the Rising Tide method that the court had previously approved. But Flatiron demanded nothing of the sort. Nor did the Seventh Circuit suggest in *Huber* that the hypothetical situation it raised necessitates the adoption of a different method of distribution.[4] The Seventh Circuit contrasted cases where the Rising Tide method was rejected because nearly half or a majority of the investors would receive nothing under the method. *Huber*, 702 F.3d at 907 (citing *Byers*, 637 F. Supp. 2d at 182, and *U.S. Commodity Futures Trading Comm'n v. Barki, LLC*, No. 3:09-cv-106-MU, 2009 WL 3839389 (W.D.N.C. Nov. 12, 2009)). It maintained that Rising Tide should be applied in cases where a much smaller percentage of investors would receive nothing, but included the hypothetical as a note of caution that a court applying that method must nevertheless do so in an equitable manner that takes into account the facts and circumstances of individual investors.

Here, contrary to the district court's suggestion, Flatiron *consented* to the application of the Rising Tide method. Flatiron's objection was that a rigid, unthinking application of Rising Tide under the unique circumstances of this case resulted in the distortion of economic reality and in serious unfairness. Because the

---

[4] That is why there are no cases employing the "maximum balance" method. No such method exists. As explained in *Huber*, this "approach," such as it is, is merely a way to ensure that the Rising Tide method is applied equitably.

district court ignored the economic reality, Flatiron has been prejudiced with a significantly higher pre-receivership recovery percentage, which has effectively foreclosed Flatiron's chances of recovering any of its losses. Indeed, Flatiron has suffered an even greater injustice than the hypothetical investor in *Huber*. Unlike that hypothetical investor, Flatiron did not knowingly reinvest withdrawn funds: both the temporary withdrawal and the subsequent return of the funds to Radar were part and parcel of the same fraud perpetrated on Flatiron by Varacchi.

B. <u>The District Court's Calculation Undermines the Equity-Based Objectives of the Rising Tide Method</u>

Any methodology meant to guide a distribution plan is merely a means to achieve an equitable distribution. The objective of the Rising Tide method is to provide a framework for the equitable distribution of receivership assets. *See S.E.C. v. Callahan*, 193 F. Supp. 3d 177, 199 (E.D.N.Y. 2016) (noting that "courts have tended to favor the 'rising tide' approach as more equitable. . . ."); *Wilson*, 2013 WL 3776902, at *7 ("[T]he Rising Tide Method is the most equitable approach."); *S.E.C. v. Parish*, No. 2:07-cv-00919-DCN, 2010 WL 5394736, at *8 (D.S.C. Feb. 10, 2010) (noting that "Rising Tide is the more equitable approach" as compared to the Net Loss method). Specifically, Rising Tide seeks to ensure that those who have recovered less prior to the initiation of the receivership are prioritized earlier in the distribution process. The district court's calculation method here fails to advance, and indeed undermines, this goal.

Rising Tide promotes equity in two ways. It prevents those who received pre-receivership distributions from obtaining an unfair windfall at the expense of those who received less or nothing. *See U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*, No. 07-cv-3598, 2010 WL 960362, at *9 (N.D. Ill. Mar. 15, 2010). The method recognizes that because there is a fixed amount of receivership assets, those who received distributions before the scheme's collapse necessarily have reduced the amount available to other claimants. *Id.* Accordingly, the method prevents the unfairness of allowing investors to retain those benefits while continuing to recover to the detriment of those who lost more in the scheme. *Id.*

In addition, Rising Tide equalizes the degree of recovery among all claimants. *See Alleca*, 2017 WL 4174217, at *4 ("The basic goal of the rising tide allocation is to equalize recovery for victims regardless of whether the recovery comes before or after the commencement of the receivership." (internal quotation marks and alteration omitted)). By bringing all claimants up to the same "water mark," the method places all claimants in the same position following the distribution.

In this case, the district court's calculation of Flatiron's pre-receivership recovery percentage undermines both objectives.

*First*, the calculation did not, as the district court suggested, prevent Flatiron from receiving an unfair windfall at the expense of those who received less. To the contrary, the district court unfairly disadvantaged Flatiron *vis-à-vis* other claimants.

24

While Flatiron temporarily received a $2 million refund, that refund was not a distribution in any sense (formal or informal), nor was it understood by the parties as such. Flatiron obtained no benefit from the withdrawal. Thus, instead of protecting claimants who are worse off, the district court's calculation allows claimants with a recovery percentage between 20.74% and 43.06% to receive a windfall at Flatiron's expense. Even though these investors are similarly situated to Flatiron when the economic reality is considered, under the district court's decision, they would receive distribution priority over Flatiron.[5]

*Second*, the District Court's calculation does not equalize the degree of recovery among claimants. Flatiron's actual recovery percentage is 20.74%, but because of the court's distorted accounting, Flatiron will not receive distributions until others have recovered 43.06% of their losses. At that point, it is unlikely that *any* assets will remain for Flatiron to recover. By inflating Flatiron's recovery percentage, the district court's calculation allows other investors to cut ahead and

---

[5] The district court counted the February 2015 withdrawal in its calculation, in part, because Flatiron received funds that were "commingled with other investor funds." SPA 24. This was error. The distribution of commingled funds is counted in Rising Tide to prevent investors who took from a limited pool of assets from receiving a windfall. But here, Flatiron immediately returned those funds to Radar and consequently did not receive a benefit. The Receiver has not otherwise shown how other investors were harmed by the in-and-out transfers. Thus, the fact that the withdrawn funds were commingled, while supporting application of Rising Tide method overall (to which Flatiron consented), does not warrant penalizing Flatiron, a victim of the fraud, with a higher pre-receivership recovery percentage.

increase their recovery at the expense of Flatiron, which did not in fact recover 43.06% of its actual total investment.

In sum, the district court's calculation is inconsistent with the policy objectives of Rising Tide and contrary to equity. The beneficiaries of this accounting are claimants who withdrew *a greater percentage of* funds than Flatiron. These claimants have wrongfully gained distribution priority over Flatiron, due solely to the inflated recovery percentage caused by the district court's calculation. Prioritizing distribution to those who have recovered to a greater degree is fundamentally inconsistent with the objective Rising Tide is intended to advance. For these reasons, the district court failed to apply equity and thus erred as a matter of law.

C.   The District Court's Calculation Method Is Inequitable Because It Punishes Flatiron for Being Defrauded by Defendants

In finding that Flatiron's pre-receivership recovery percentage is 43.06%, the district court treated the February 26, 2015 temporary withdrawal as a distribution and the March 2, 2015 transfer as an additional investment – thereby inflating each side of the ledger by $2 million. But these two transactions occurred solely due to circumstances caused by Varacchi's deception and misappropriation of Flatiron's assets. It was therefore inequitable for the district court to ignore this context and credit these transfers in calculating Flatiron's recovery percentage, especially

because doing so punishes Flatiron for being repeatedly victimized by Varacchi's fraud.

The discovery taken by the Receiver confirmed that Varacchi induced Crawford to move Flatiron's assets to the Radar platform with the false promise that the funds would be kept in a "segregated subaccount" and that Flatiron would receive monthly account statements. JA 397, 761. Shortly after receiving Flatiron's investment, however, Varacchi misappropriated those funds to perpetuate the Ponzi scheme. JA 735-36, 807-10. Flatiron's assets were not, in fact, placed in any subaccount. Consequently, Varacchi could not provide Flatiron and its fund administrator with account access or an account statement needed for the NAV calculation. JA 790-94. Solely for the purpose of allowing the fund administrator to calculate the NAV, Crawford requested a refund of Flatiron's initial investment. JA 795. Flatiron then transferred the funds back to Radar within days, confirming Crawford's sworn testimony that the return of funds was temporary. JA 398. Following discovery, the Receiver conceded that Varacchi could not provide an account statement or written verification because a segregated account "did not exist," confirming that Flatiron was a victim of Varacchi's fraud. *See* JA 734, 790-95.

By ignoring the circumstances surrounding the withdrawal and subsequent return of Flatiron's $2 million, the district court penalized Flatiron for being a victim

of Varacchi's scheme. Had Flatiron's investments been segregated in a subaccount as promised, Flatiron's fund administrator would have received account access and the transfers would have been unnecessary. In this scenario, Flatiron's recovery percentage would unquestionably have been 20.74%, instead of 43.06%. The factual circumstances that even make this an issue in dispute stem entirely from Varacchi's deception.

The Receiver's argument – which the district court adopted – that Flatiron could have chosen not to "reinvest" the $2 million wrongly assumes that Flatiron knew Varacchi was operating a Ponzi scheme and thus was in a position to make a voluntary and informed choice. To be sure, Flatiron would have been in a better position, with a greater chance of recovering its losses, had it not been defrauded at every step of the way. But that is not what happened. To hold Flatiron accountable for its own victimization is unfair and unreasonable. Moreover, it is inconsistent with a key objective of the Rising Tide method, which is to favor and prioritize investors who have been harmed to a greater extent by the scheme. *See Coadum Advisors, Inc.*, 2009 WL 10664889, at *6 ("[E]quity demands that those . . . investors who received no pre-receivership withdrawals during the scheme take temporary distribution priority. . . ."). That objective favors Flatiron. The district court's disregard of these facts and its mechanical application of Rising Tide are therefore inequitable.

## II.   <u>The District Court's Calculation Relied on Clearly Erroneous Factual Findings</u>

To the extent the district court considered the facts, its calculation was based on clearly erroneous findings. Treating the February 26, 2015 withdrawal as a redemption and the March 2, 2015 transfer as a reinvestment was clearly erroneous. The undisputed record confirms that the refund was made temporarily for a purely administrative purpose, and therefore, the initial transfer in and out should have been omitted from the calculation.

A factual "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 565 (1985) (internal quotation marks omitted). A district court abuses its discretion if its findings of fact are based on a "clearly erroneous assessment of the evidence." *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc*., 572 U.S. 559, 564 n.2 (2014) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)) (internal quotation marks omitted).

The record evidence here – which is undisputed after discovery – indicates that the February and March transfers were not investment choices of the kind typically recognized in the Rising Tide calculation. It is undisputed that, after Flatiron made the January investment, the fund administrator needed proof that the funds were kept at Radar for its NAV calculation. JA 795-98. Because he had

misappropriated the investment, Varacchi could not provide Flatiron and the fund administrator with account access or a statement. JA 790-93. Due to the delay, Flatiron sought a temporary refund of $2 million so that the NAV calculation could be completed. JA 795. Flatiron received the $2 million on February 26, 2015, and, consistent with the intention to keep these funds invested in Radar, transferred the money back to Radar only a few days later, on March 2, 2015. JA 398.

Even with the benefit of discovery, there is no evidence indicating that these transactions were investment decisions. There was no redemption request or paperwork showing that the withdrawal was a distribution. Similarly, there is no evidence suggesting that Crawford ever intended, or even considered, keeping the refunded money or investing it elsewhere. Thus, the evidence permits only one reasonable factual finding: the withdrawal was a temporary refund not an actual recovery.

While the Receiver initially questioned the purpose of these transactions, following discovery, he has acknowledged that Crawford had little choice but to seek a temporary refund because Varacchi could not provide "an account statement or written verification" since a segregated account "did not exist." JA 734, 790-98.[6]

---

[6]     In his initial motion, filed before discovery was taken, the Receiver asserted that Flatiron "engaged in some trading in January[] 2015" because FPLLC (not Flatiron) received $22,132.45 on February 20, 2015 "in trading 'profits' or 'fees.'" JA 333. After discovery was completed, however, the Receiver conceded that

The Receiver nevertheless argued that Flatiron "had the choice not to reinvest." JA 728. That is wrong. It is undisputed that Crawford did not view the withdrawal as a chance to reevaluate his investment choices, but as a mere step towards completing an administrative task. Moreover, the record indicates that Crawford had no cause to reconsider whether to maintain Flatiron's investment or keep the $2 million. This is because Crawford was wholly unaware of Varacchi's fraudulent scheme. JA 769, 774-75. Indeed, following Flatiron's initial $2 million investment, Flatiron invested *another $3.1 million in Radar*. JA 399. None of these contentions were disputed by the Receiver.

Nevertheless, the district court adopted the Receiver's assertion – based nowhere in the evidence – that the March return of the $2 million refund was a reinvestment. Because this finding was unsupported by the evidence, treating the transactions as a redemption and a deliberate reinvestment constitutes a clearly erroneous assessment of the record. The district court accordingly abused its discretion in its (limited) evaluation of the facts.

---

Flatiron and FPLLC did not have their respective accounts set up for "trading on Sentinel's platform until March 2015." JA 736. The Receiver has thus acknowledged that the $22,132.45 payment could not have been a performance fee based on Flatiron's trading activity. *Id.* Further, Flatiron agreed that this payment to FPLLC would be considered as a recovery to Flatiron for purposes of calculating its pre-receivership recovery percentage. Accordingly, this transaction is wholly irrelevant to the issues in this appeal.

## III.   <u>Flatiron Is Seeking Narrow Relief</u>

Because the district court's calculation is inequitable and relies on clearly erroneous findings of fact, this Court should vacate the district court's ruling and remand for the district court to apply the Rising Tide method equitably. To be clear, the relief Flatiron is seeking on remand is limited in scope: Flatiron is simply seeking the adjustment of its recovery percentage under Rising Tide to 20.74% – relief to which no other claimant has objected.

Importantly, Flatiron's requested relief will not be administratively burdensome or delay recovery for others. Contrary to the district court's ruling, Flatiron is not requesting the court apply, or even consider, a new method of distribution. The court has already approved the Rising Tide method, which Flatiron agrees should apply.

Nor will the requested relief require various adjustments to multiple claimants' recovery percentages, as the district court erroneously assumed.  Flatiron requested only that the district court apply the Rising Tide method equitably with respect to Flatiron's pre-receivership recovery percentage. And because no other claimant has objected to the Receiver's calculation, on remand, the court will not need to make adjustments for other claimants. Thus, the requested relief simply seeks a small modification to, and not a substantial alteration of, the Receiver's distribution plan.

Finally, the requested relief will not require claimants who received payouts under the initial distribution to disgorge their recovery. The Receiver has conceded that any adjustment to Flatiron's pre-receivership recovery percentage would only "affect *future* distributions." JA 218. The initial distribution only "raise[d] the tide of recovery to 20.1%," and thus, Flatiron would not have been entitled to recover yet, even if its percentage had been adjusted. JA 145. There have been no subsequent interim distributions since the initial distribution. *See* JA 1-23. Accordingly, the requested relief would only apply prospectively to future interim distributions and will not require recalculation of funds already distributed.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should vacate the district court's ruling and remand with instructions to hold that Flatiron's pre-receivership recovery is 20.74%.

Dated:  New York, New York
       January 5, 2022

Respectfully submitted,

SHER TREMONTE LLP

By: /s/Noam Biale
Theresa Trzaskoma
Noam Biale
Cathy Liu
90 Broad Street, 23rd Floor
New York, NY 10004
T: (212) 202-2600
F: (212) 202-4156
ttrzaskoma@shertremonte.com

*Attorneys for Flatiron Partners, LP*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel of record for Appellant Flatiron Partners, LP certifies pursuant to Federal Rule of Appellate Procedure 32(g)(1) that the foregoing brief contains 7,627 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the Word Count feature on Microsoft Word; and that the brief has been prepared in 14-point Times New Roman font.

Dated:  New York, New York
       January 5, 2022


                       /s/ Noam Biale
                       Noam Biale
                       Sher Tremonte LLP