# 21-2245(L)

## 21-2247(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆———◆

RECEIVER JED HORWITT, ESQ.,

*Receiver-Appellee,*

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff,*

—against—

FLATIRON PARTNERS, LP, NEILA FORTINO,

*Claimants-Appellants,*

MARK J. VARACCHI, SENTINEL GROWTH FUND MANAGEMENT LLC,
RADAR ALTERNATIVE FUND LP, RELIEF DEFENDANT,
RADAR ALTERNATIVE MASTER FUND SPC, RELIEF DEFENDANT,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT (NEW HAVEN)

---

## BRIEF FOR RECEIVER-APPELLEE JED HORWITT, ESQ.

---

STEPHEN M. KINDSETH
JAMES M. MORIARTY
ZEISLER & ZEISLER, P.C.
10 Middle Street, 15th Floor
Bridgeport, Connecticut 06604
(203) 368-4234

*Attorneys for Receiver-Appellee
Jed Horwitt, Esq.*

# **Table of Contents**

PRELIMINARY STATEMENT ............................................................................ 1

JURISDICTIONAL STATEMENT ................................................................... 2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ......................... 3

STATEMENT OF THE CASE ........................................................................... 3

I.   Procedural History .................................................................................... 3

    A.   The SEC Enforcement Action and Appointment of the Receiver ....... 3

    B.   Receiver's Claims Procedure and Plan of Distribution ..................... 5

    C.   The Claims Determination Motions and Summary Procedures ........... 8

II.  Factual Background – The Flatiron Claim ................................................ 11

    A.   Flatiron's Relationship with Defendants and the $2 Million Transfers ............. 11

    B.   Flatiron is Paid with Other Investor's Funds ................................... 13

III. Factual Background – The Fortino Claim ................................................ 16

    A.   The Creation of the Agency Relationship ......................................... 16

    B.   Transfers from Sentinel to MTG for Ms. Fortino's Benefit ............... 18

    C.   The Continuation of the Agency Relationship .................................. 19

    D.   Sideris Paid Income Taxes on Ms. Fortino's Behalf ........................ 21

SUMMARY OF THE ARGUMENT ................................................................ 21

STANDARD OF REVIEW .............................................................................. 23

ARGUMENT .................................................................................................... 24

I.   The District Court Correctly Applied the Plan Methodologies to Flatiron's Claim ... 24

    A.   The Plan Methodologies Take into Account All Transfers Between the Receivership Entities and the Claimant ................................................. 24

    B.   The District Court Correctly Calculated Flatiron's Pre-Receivership Recovery Percentage ........................................................................................ 26

    C.   There is No "Equitable Exception" to the Plan Methodologies and, to the Contrary, Equity Compels Their Uniform Application ......................... 27

    D.   The Maximum Balance Approach Should Not Apply ........................ 30

    E.   The District Court Did Not and Did Not Need to Characterize Flatiron's $2 Million Transfers ............................................................................. 34

II.  The District Court Correctly Applied the Plan Methodologies to Ms. Fortino's Claim ............................................................................................................ 35

    A.   Through the MTG Account, Sideris Acted as Ms. Fortino's Agent in Transferring and Receiving Funds from Sentinel .............................. 35

i

**B.**    **Ms. Fortino Did Not Assert or Attempt to Prove and, Therefore, Waived Any Adverse Interest Exception Defense** ...................................................................... 37

    **C.**    **Ms. Fortino's Claim Cannot Exceed the Amount Retained by Sentinel** ............ 40

    **D.**    **The District Court did not Consider the Effect of Tax Payments Made by Simmons on the Amount of Ms. Fortino's Claim** ................................................ 45

**CONCLUSION** ............................................................................................................ 47

## <u>Table of Authorities</u>

**Cases**

*Aiello v. Stamford Hosp.*,
    487 Fed. Appx. 677 (2d. Cir. 2012) .................................................................. 44

*Anderson v. Bessemer City*,
    470 U.S. 564 (1985) ......................................................................................... 27

*Anderson v. Meyers (In re Infinity Bus. Grp., Inc.)*,
    612 B.R. 76 (D. S.C. 2019) ............................................................................. 43

*Boucher Imps., Inc. v. Old Carco LLC (In re Old Carco LLC)*,
    438 Fed. Appx. 30 ............................................................................................. 28

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
    631 F.3d 42 (2d Cir. 2011) ............................................................................... 27

*CFTC v. Walsh*,
    712 F.3d 735 (2d Cir. 2012) ............................................................................. 32

*Fisher v. Vassar College*,
    70 F.3d 1420 (2d Cir. 1995) ............................................................................. 44

*Henry v. Champlain Enters.*,
    Inc., 445 F.3d 610 (2d Cir. 2006) .................................................................... 27

*Manhattan Enter. Grp., LLC v. Higgins*,
    816 Fed. Appx. 512 (2d. Cir. 2020) ................................................................. 44

*New Hartford v. Connecticut Res. Recovery Auth.*,
    291 Conn. 433, 970 A.2d 592 (2009) .............................................................. 47

*Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*,
    467 F.3d 73 (2d Cir. 2006) ............................................................................... 37

*Reider v. Andersen*,
    47 Conn. Supp. 202 (2001) .............................................................................. 43

*Resnik v. Morganstern*,
    100 Conn. 38, 122 A. 910 (1923) .................................................................... 42

*SEC v. Credit Bancorp, Ltd.*,

No. 99-CV-11395-RWS, 2000 U.S. Dist. LEXIS 17171 (S.D.N.Y., Nov. 29, 2000) .................................................................................................. 38

*SEC v. Hardy*,
803 F.2d 1034, (9th Cir. 1986) .......................................................... 33

*SEC v. Huber*,
702 F.3d 903 (7th Cir. 2012) ......................................... 29, 30, 35, 36

*SEC v. Parish*,
No. 2:07-CV-00919-DCN, 2010 U.S. Dist. LEXIS 11757 (D.S.C. Feb. 10, 2010) ................................................................................................... 30

*SEC v. Wealth Mgmt.*,
628 F.3d 323 (7th Cir. 2010) ................................................. 6, 29, 32

*Tobacco Tech., Inc., v. Taiga Int'l N.V.*,
388 Fed. Appx. 362 (4th Cir. 2010) ................................................. 43

*Tolbert v. Queens Coll.*,
242 F.3d 58 (2d Cir. 2001) ................................................................ 40

*United States CFTC v. Mason*,
No. 3:13-CV-196-GCM, 2014 U.S. Dist. LEXIS 147770 (W.D.N.C. Oct. 14, 2014) ............................................................................................. 30, 39

**Statutes**

28 U.S.C. § 1292(a)(1) .......................................................................... 7

28 USC § 1291 ........................................................................................ 7

**Rules**

Fed. R. Civ. P. 52(a)(6) ........................................................................ 27

## PRELIMINARY STATEMENT

In adjudicating the claims asserted against the receivership estate by each of the appellants, Flatiron Partners L.P ("Flatiron") and Neila Fortino ("Ms. Fortino" and, collectively, with Flatiron, the "Claimants"), the district court correctly applied the "Claim Calculation Methodology" and the "Rising Tide Method" of distribution (sometimes, collectively, the "Plan Methodologies"). The district court had previously approved and authorized these Plan Methodologies by its order approving and authorizing the plan of distribution proposed by the appellee, Jed Horwitt, Esq., in his capacity as the court-appointed receiver (the "Receiver") for Sentinel Growth Fund Management, LLC ("Sentinel"), Radar Alternative Fund LP ("Radar LP") and Radar Alternative Master Fund SPC ("Radar SPC").[1] Neither Claimant appealed that order.

Instead, they here appeal the district court's application of those Plan Methodologies to their particular claims. The Receiver proposed and the district court approved "summary procedures" to adjudicate each of the Claimants' claims. In accordance with the summary procedures, the parties engaged in discovery and submitted affidavits, documents and briefs in support of their respective positions—submitting to, essentially, an "on-the-papers" bench trial. After oral argument, the

---

[1] Radar SPC and Radar LP are referred to herein collectively as the "Relief Defendants," and the Relief Defendants together with Sentinel are referred to herein, collectively, as the "Receivership Entities."

1

district court held that, in accordance with the Plan Methodologies: (i) as to Flatiron, all transfers between the Receivership Entities and Flatiron should be taken into account; and (ii) as to Ms. Fortino, all transfers between the Receivership Entities and Ms. Fortino's agent should be taken into account. The district court adjudicated the Claimants' claims accordingly.

The Receiver respectfully submits that the district court correctly applied the applicable Plan Methodologies (which it had previously ordered) to the Claimants and in a manner consistent with the Receiver's application of these methodologies to all other claimants in this receivership proceeding. There is no legal basis to deviate from these methodologies. There is also no "equitable exception" available to the Claimants. To the contrary, "[w]here investors' assets are commingled and the recoverable assets in a receivership are insufficient to fully repay the investors, 'equality is equity.'" *SEC v. Wealth Mgmt.*, 628 F.3d 323, 333 (7th Cir. 2010) (quoting *Cunningham v. Brown*, 265 U.S. 1, 13 (1924)).

## JURISDICTIONAL STATEMENT

The Receiver agrees with Flatiron's conclusion concerning this Court's jurisdiction for the reasons set forth in its Appellant's Brief concerning this Court's

jurisdiction. This Court has jurisdiction over the appeals of Flatiron and Ms. Fortino pursuant to 28 U.S.C. § 1292(a)(1) and the collateral order doctrine.[2]

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether the district court erred in its application of the Plan Methodologies to adjudicate Flatiron's claim?

2.     Whether the district court erred in its application of the Plan Methodologies to adjudicate Ms. Fortino's claim?

## STATEMENT OF THE CASE

### I.     Procedural History

### A.     The SEC Enforcement Action and Appointment of the Receiver

On February 2, 2017, the plaintiff, the Securities and Exchange Commission (the "Commission") commenced this action by filing its complaint (the "Complaint") against Mark J. Varacchi ("Varacchi") and Sentinel (collectively the "Defendants"), and the Relief Defendants. The Complaint alleged that the Defendants engaged in a fraudulent scheme to misappropriate the assets of certain individuals and businesses who sought to invest in the Relief Defendants (collectively, the "Investors"), and that in the course of their scheme, the Defendants

---

[2] Ms. Fortino contends that this Court has jurisdiction over her appeal pursuant to 28 USC § 1291, but cites no authority for the proposition that the district court order she appeals from constitutes a final order for purposes of appeal. The Receiver does not address Ms. Fortino's argument because this Court has jurisdiction over her appeal pursuant to 28 U.S.C. § 1292(a)(1) and the collateral order doctrine.

commingled their assets with the Investors' funds. (Compl. ¶¶21-26, Joint Appendix ("A") A-24-40). According to the Complaint, between at least December 2015, and November 2016, the Defendants misappropriated no less than $3.95 million of Investor assets intended for or held by the Relief Defendants, which were two private funds that the Defendants advised. (*Id.* ¶2, A-24). The Defendants commingled their assets with Investors' assets and made withdrawals from the Relief Defendants that Investors did not authorize, which the Defendants used for personal and business expenses and to pay prior Investors. (*Id.* ¶26, A-31). Sentinel's bank account included funds that Sentinel and Varacchi had obtained from their investors or the Relief Defendants' Investors for purposes of investment as well as deposits from the Relief Defendants. (*Id.* ¶¶21-26, A-29-30). Withdrawals from Sentinel's bank account included payments to Investors and payments for Varacchi's personal benefit. (*Id.* ¶26, A-31).

On February 1, 2017, Varacchi pled guilty to criminal charges arising out of the fraudulent scheme. *See USA v. Varacchi*, 1:17cr76 (SDNY). Thereafter, the Defendants and the Relief Defendants stipulated to the entry of judgment in the Commission's favor on the Complaint and judgement entered on May 1, 2017. (A-4, Docket Index ("D.I.") 13).

On April 18, 2017, the Commission filed its Assented to Motion for Appointment of a Receiver seeking the appointment of Jed Horwitt, Esq. (A-4, D.I.

4

10). The Receiver was appointed by order dated May 1, 2017, and reappointed by order dated February 14, 2018 (collectively the "Receivership Orders") (A-4, D.I. 12; A-7, D.I. 47). The terms of the Receivership Orders grant the Receiver the power to "assume control of, marshal, pursue, and preserve the [assets of the Receivership Entities] with the objective of maximizing the recovery of assets, and, to the extent that assets recovered are inadequate to make defrauded investors whole, ensuring that the distribution of those assets is as just and equitable as practicable." (Receivership Orders ⁋ 2, A-42-43; ⁋ 2, A-101).

## B. Receiver's Claims Procedure and Plan of Distribution

On July 27, 2017 the Receiver filed a Motion to Approve Claims Procedure and on March 12, 2018 filed a Supplemental Motion to Approve Claims Procedure. (A-5, D.I. 23; A-7, D.I. 53). By orders dated July 31, 2017 (A-5, D.I. 24), and April 2, 2018 (A-7, D.I. 53), the district court entered orders respectively granting the Receiver's Claims Procedure Motion and Supplemental Claims Procedure Motion (collectively the "Claims Procedure Orders").

Ms. Fortino submitted a timely Proof of Claim dated September 14, 2017. In her Proof of Claim Ms. Fortino alleged a claim in the amount of $4,038,000 based on an alleged investment of $4,700,000 in Sentinel and a return received by her in the amount of $662,000. (A-546). Ms. Fortino subsequently admitted in an August 2019 affidavit (the "Fortino Affidavit") submitted in opposition to the Receiver's

5

initial motion to determine her claim that of the $4.7 million she claims to have invested with Sentinel, only $4 million went to Sentinel; the remaining $700,000 was transferred directly to Varacchi's personal bank account. (Fortino Aff. ¶¶19-20, A-355-58).

Flatiron also submitted a timely Proof of Claim dated September 28, 2017. In its Proof of Claim, Flatiron alleged a claim in the amount of $4,496,205.28 with a claim period of January 15, 2015, through December 8, 2016. (A-747-52). Flatiron and the Receiver ultimately agreed that the amount of Flatiron's Claim was $4,014,992.62. (Mot. Plan Approval ¶48, A-126; A-163).

On July 12, 2018 the Receiver filed his Motion for Entry of an Order Approving and Authorizing the Receiver's Proposed (I) Pooling of Assets and Liabilities of Receivership Entities, (II) Allowance of Certain Claims, (III) Plan of Distribution and (IV) Related Relief (the "Motion for Plan Approval"). (A-112-79). The Motion for Plan Approval requested that the district court enter an order approving, among other things:

> i. The "Claims Calculation Methodology" which the Receiver applied to evaluate the timely filed Claims (as described more fully in Section V of the Motion for Plan Approval);
> ii. The Receiver's proposed determination of Allowed Claims as set forth in Exhibit A to the Motion for Plan Approval;
> iii. The proposed treatment of six (6) unresolved Claims (the "Remaining Disputed Claims") as set forth in Exhibit B to the Motion for Plan Approval; and

6

iv. The Rising Tide Method of *pro rata* distribution (as described more fully in Section VI of the Motion for Plan Approval).

(Mot. Plan Approval ¶¶119(i-vii), A-117-18).

On October 4, 2018, the District Court entered an order (the "Plan Approval Order") authorizing and approving the relief sought in the Motion for Plan Approval including, but not limited to, the Claims Calculation Methodology and the Rising Tide Method of *pro rata* distribution. (Plan Approval Order ¶¶3 & 6, A-191).

On October 5, 2018, the Receiver filed a supplement to the Motion for Plan Approval (the "Supplement") to inform the district court that after the Motion for Plan Approval had been filed, but before the Plan Approval Order entered, the Receiver had received: (i) a Claimant's limited objection to the method of distribution by Flatiron (the "Limited Objection"); and (ii) a separate late filed Claim. (A-217-27). The Limited Objection focused on the narrow issue of whether Flatiron's initial $2 million investment in Radar LP, and subsequent return of $2 million from Sentinel, should be included in the calculation of its claim. (Suppl. ¶¶5-6, A219). Adjudication of the Limited Objection did not necessitate modification to the relief granted by the Plan Approval Order, other than a ministerial substitution of exhibits to that order, because even under Flatiron's proposed calculation of its claim it would not have participated in the initial distribution to claimants that was to be made pursuant to the Plan Approval Order. (*Id.* ¶¶7-11, A-220-222). Flatiron reserved its rights to assert the Limited Objection, but only the Limited Objection,

*i.e.*, Flatiron did not object more broadly to the Claims Calculation Methodology and did not object to the Receiver's request to use the Rising Tide Method of distribution.

### C. The Claims Determination Motions and Summary Procedures

On July 2, 2019, the Receiver filed a Motion for Determination of Claim Held by Neila Fortino (the "Fortino Claim Motion"), (A-228-318), which Ms. Fortino opposed (the "Fortino Opposition") on August 29, 2019. (A-343-75). Ms. Fortino included with her opposition, *inter alia*, the Fortino Affidavit setting forth certain purported facts in support of her opposition. (*Id.*, A-354-58).

On July 19, 2019, the Receiver filed a Motion for Determination of Claim Held by Flatiron Partners, LP (the "Flatiron Claim Motion"), (A-319-42), which Flatiron opposed (the "Flatiron Opposition") on August 23, 2019. (A-376-99). Flatiron included with its opposition, *inter alia*, a declaration of its principal Brett Crawford ("Mr. Crawford") setting forth certain purported facts in support of the opposition. (*Id.*, A-396-99).

In response to the Fortino and Flatiron Oppositions, on December 12, 2019, the Receiver filed a motion for summary procedures (the "Summary Procedures Motion") seeking, *inter alia*, leave to take limited discovery concerning both the Fortino Claim and Flatiron Claim. (Summ. Procedures Mot., A-400-13). The Summary Procedures Motion was granted over the objection of both Ms. Fortino and Flatiron by order dated March 20, 2020. (A-501-12). The district court thereafter

entered the parties agreed to discovery schedule, (A-513), and the parties engaged in discovery, including document production and depositions of Ms. Fortino and Mr. Crawford. Flatiron and Ms. Fortino chose not take any depositions. All discovery was completed by the court-ordered discovery completion date of September 30, 2020.

On January 15, 2021, the Receiver filed his: (i) Renewed Motion to Determine the Claim of Neila Fortino, along with a supporting memorandum of law and exhibits A-T (the "Renewed Fortino Motion") (A-519-722); and (ii) Renewed Motion to Determine the Claim of Flatiron Partners, LP, along with a supporting memorandum of law and exhibits A-K (the "Renewed Flatiron Motion"). (A-723-822). Ms. Fortino filed her opposition to the Renewed Fortino Motion with Exhibits A and B (the "Renewed Fortino Opposition") on February 26, 2021. (A-823-922). Flatiron filed its opposition to the Renewed Flatiron Motion with Exhibit A (the "Renewed Flatiron Opposition") on March 5, 2021. (A-923-44). On March 19, 2021, the Receiver filed replies in support of both the Renewed Fortino Motion, (A-945-52), and Renewed Flatiron Motion (A-953-62).

On July 22, 2021, the district court conducted a hearing on both the Renewed Fortino Motion and Renewed Flatiron Motion. The District Court identified the Fortino dispositive issue as "whether or not funds received by [her] so-called agent can properly be accredited to her." (Tr. July 22, 2021 Mot. Hr'g ("Hr'g Tr."), at A-

9

967(13-20).[3] Ms. Fortino's counsel suggested that the Receiver's counsel had raised the agency argument for the first time in its reply. (*Id.*, at A-968(21)-A969(1)).[4] In response, the district court asked Ms. Fortino's counsel if he needed "time to respond" to the Receiver's agency argument, (*id.*, at A969(16-18)), and then asked counsel:

> I mean, I guess the question is, taking the agency law issue on the merits, is there a legal basis that you are aware of suggesting that the agency law that the receiver suggests is applicable here should not be applied, leaving aside the procedural argument?

(*Id.*, at A-969(12-23)). Ms. Fortino's counsel did not identify any principles of agency law suggesting that the Receiver's cited agency law should not be applied, and did not request additional time to respond to the Receiver's agency law argument.

The district court then moved to the Renewed Flatiron Motion, first identifying the "seminal issue" as Flatiron seeking the application of the "maximum balance" approach to its claim, (*id.*, at A-973(12-24)), and then, after argument from counsel, framing the issue as Flatiron seeking application of the Rising Tide Method to its claim in a way that was different from the application of the Rising Tide Method to the claims of all other claimants. (*Id.*, at A-975(15-24) A-977(15-19)).

---

[3] Citations to the Hr'g Tr. are to the Joint Appendix page and transcript lines.

[4] In its July 30, 2021 Ruling and Order on Pending Motions (the "District Court Decision"), the district court rejected the argument that the Receiver raised the agency argument for the first time in his reply. (SPA-13, at n.5).

The District Court Decision issued shortly after the July 22 hearing. In the District Court Decision, the district court adjudicated the Claimants' claims as proposed by the Receiver in each of the Renewed Fortino Motion and the Renewed Flatiron Motion. (Special Appendix ("SPA") SPA-2).[5] This appeal followed.

## II.     Factual Background – The Flatiron Claim

### A.     Flatiron's Relationship with Defendants and the $2 Million Transfers

Flatiron was an investment fund managed by Mr. Crawford through his single member limited liability company, Flatiron Partners, LLC ("FPLLC"). (Sept. 23, 2020 Remote Dep. Brett Crawford ("Crawford Tr."), at A755(21)-756(8); A-757(22-25)). Mr. Crawford met Varacchi in the summer of 2014, and began discussing with Varacchi moving Flatiron's fund to Sentinel's trading platform—at that time Flatiron conducted its trading through a platform operated by Interactive Brokers or a different trading firm. (*Id*., at A-758(23)-759(20); A-760(24)-761(8)).

Mr. Crawford made the decision to move Flatiron's fund to the Sentinel platform in early January 2015. On January 6, 2015, Mr. Crawford sent an email to Varacchi stating "[i]f you're serious about starting this week, I should review the following docs: 1. ICBC, 2., LP, 3. IA." (A-784-86). The reference to starting this week refers to Flatiron beginning trading on the Sentinel platform. (Crawford Tr., at

---

[5] The Special Appendix refers to the Special Appendix included as an attachment to Ms. Fortino's Appellant's Brief.

A-762(15-19)). In the same January 6, 2015 email chain Varacchi invited Mr. Crawford to Sentinel's offices in Stamford, Connecticut, to work "the last stuff out."

On January 14, 2015, FPLLC signed an Investment Management Agreement ("Flatiron IMA") with Sentinel. Pursuant to the Flatiron IMA, FPLLC would serve as investment manager with Sentinel as the client. The Flatiron IMA provided that FPLLC would be compensated in accordance with Schedule A to the Flatiron IMA, but the Flatiron IMA does not include a Schedule A. (Crawford Tr., at A-769(12)-772(3)). Mr. Crawford testified that FPLLC was to manage and trade two separate sub-accounts on the Sentinel platform. One segregated account would be for Flatiron's fund and consist of $2 million of Flatiron's capital. Trading would take place in that account and gains (or losses) would remain in that account. The second account would consist of capital allocated to FPLLC by Sentinel, and trading would also occur in that account and be managed by Mr. Crawford through FPLLC. Mr. Crawford further testified that FPLLC would be compensated based on "30 percent incentive. It would be the performance fee only." (*Id.*, at A-763(10-17); A-772(12-17)). FPLLC did not have a guaranteed payout with Sentinel or either of the Relief Defendants. (*Id.*, at A-772(20-25)).

Flatiron wired $2 million to Radar LP's account with Sentinel's prime broker on January 15, 2015. Varacchi wanted Flatiron to wire the funds to Sentinel, but in a January 13, 2015 email, Mr. Crawford told Varacchi that Flatiron's fund

administrator, Equinox, preferred that the wire be sent to the Radar LP account. (A-788). In that same email Mr. Crawford also told Varacchi that Equinox "need[ed] an introduction to the ops people there to setup feeds for admin." (*Id.*).

After the $2 million wire was sent, Equinox continued to request access to the purported segregated account that was supposedly holding Flatiron's $2 million so that it could confirm that the funds were actually "in an account somewhere". (Crawford Tr., at A-764(2)-768(17)); A-790-93). In response to Equinox's requests for access to the account, Varacchi told Mr. Crawford that Flatiron's $2 million was actually commingled with "[Varacchi's] excess cash." (*Id.*). On February 13, 2015, Equinox sent an email to Mr. Crawford reminding him that Equinox still required account access to finalize January's net asset value analysis; Mr. Crawford responded by telling Equinox that he would be asking Varacchi to wire money back next week. (A-795-98). Equinox only needed an account statement or other written verification establishing that Flatiron's funds were held in a segregated account, but Varacchi could not provide such a statement because, as explained in more detail below, such did not exist.

### B. Flatiron is Paid with Other Investor's Funds

Flatiron's initial $2 million investment was used by Varacchi and Sentinel to further their Ponzi scheme, and Flatiron did not receive the return of its segregated

13

and identifiable $2 million from Sentinel on February 26, 2015. Instead, Flatiron was paid with other Investors' money.

On January 14, 2015, the cash balance of Radar LP's account was $317,485.60, representing largely the balance of the commingled funds obtained from other defrauded investors.[6] On January 15, 2015, Flatiron wired $2 million directly to Radar LP's single account thereby commingling it with other Investor deposits. Thereafter, there were no other deposits or withdrawals in that account until January 27, 2015, when Varacchi transferred $2 million from Radar LP's account to Sentinel's account at Bank of America. (A-808). The closing balance in Sentinel's account the day prior (January 26, 2015) was $39,696.83.

Immediately after transferring the $2 million from Radar LP to Sentinel on January 27, 2015, Varacchi caused Sentinel to distribute $1,710,000 to another Investor. (A- 809). He also then transferred an additional $175,000 on account of various private equity investments made for his personal benefit. (*Id.*) By the end of the day on January 27, 2015, the closing balance in Sentinel's account was $154,696.83. By February 9, 2015, after other withdrawals, the closing balance of Sentinel's account was $1,589.37. Over these and the following weeks, additional

---

[6] Balances in the Radar LP account and Sentinel Bank of America account on a given day were determined by Matthew Whitehouse of Verdolino & Lowey, P.C., the Receiver's retained forensic accountants.

14

Investors deposited new funds into Radar LP's account either directly or through Sentinel's account.

On February 17 or 18, 2015, Flatiron requested the withdrawal of its $2 million investment. (Crawford Tr., at A-773(25)-774(9)). Varacchi did not have it. Radar LP's account had a cash balance on February 18, 2015, of $1,361,029.38, and Sentinel's account only held $170,614.56. Flatiron then repeatedly demanded the $2 million over the course of the following week, with Mr. Crawford "bugging" Varacchi and telling him to "wrap it up and send the wire." (*Id*., at A-775(11-17)).

On February 20, Sentinel wired $22,132.45 to FPLLC. (A-822). The $22,132.45 was not a performance fee earned on trading activity because no trading had been conducted. Mr. Crawford testified that the $22,132.45 was a payout to FPLLC as part of periodic payments that Sentinel made to traders on its platform. (Crawford Tr., at A-779(22)-780(19)). But, again, Flatiron and FPLLC did not yet have a trading account on the Sentinel platform, had not entered a single trade, and had not generated any trading revenue. (*Id*., at A-781(9-14)). No 30% incentive "performance fee" had been due. The only value added by Flatiron and FPLLC warranting any return, as of February 20, 2015, was the $2 million Flatiron had invested on January 15, 2015, and Radar LP's (and Sentinel's) continued use of these funds (notwithstanding Mr. Crawford's demands for their return) to perpetuate the Ponzi scheme.

15

Varacchi continued to defraud other Investors to acquire the necessary funds to pay Flatiron, including, in particular, by a defrauded Investor's $1 million deposit into Radar LP's account on February 25, 2015. (A-813). By February 25, 2015, Radar LP's account had a cash balance of $2,333,220.71. On February 26, 2015, Varacchi caused Radar LP to transfer $1.7 million in funds to Sentinel's account in order to satisfy Flatiron's $2 million withdrawal. (A-818). After transferring $2 million to Flatiron on February 26, 2015, the closing balance of Sentinel's account for the period ending February 28, 2015 was only $22,784.72. (A-817).

Flatiron had wired $2 million to Radar LP's account on January 15, 2015, but it was Sentinel, not Radar LP, that sent the $2 million wire to Flatiron on February 26, 2015. (A-800-05; Crawford Tr., at A-776(23)-777(14)). On March 2, 2015, Flatiron once again wired $2 million to Radar LP's account. (A-800-05; Crawford Tr., at A-777(23)-778(9)).

## III. Factual Background – The Fortino Claim

### A. The Creation of the Agency Relationship

Ms. Fortino met Steven Simmons ("Simmons") in approximately February 2011. Ms. Fortino and Simmons became friends, and engaged in an on and off romantic relationship. (Sept. 16, 2020, Remote Dep. Neila Fortino ("Fortino Tr."), at A-616(1-3); A-617(8)-619(1)). In the summer of 2014, Simmons introduced Ms. Fortino to Varacchi and they solicited Ms. Fortino to invest in Sentinel; Simmons

16

was Ms. Fortino's primary point of contact with respect to her 2014 investment. (*Id.*, at A-620(23)-621(1)).

Effective July 31, 2014, Ms. Fortino entered into an Investment Management Agreement ("Fortino IMA") as the client and with Sideris Capital Partners, LLC ("Sideris") as the investment manager "to manage the assets as designated by the Client." (Fortino IMA §1, A-641). Simmons signed the Fortino IMA as "partner" for Sideris and Varacchi signed as Sideris' "COO." (*Id.*, A-641-47). The Fortino IMA guaranteed Ms. Fortino an annual return of at least fifteen percent (15%) on her investments with Sideris. (*Id.*, A-645; Fortino Tr., at A-631(9-17)). In a July 25, 2014, email Simmons described the payment terms set forth in the Fortino IMA to Ms. Fortino as reading like a "promissory note" because she would receive a guaranteed return on her investment. (A-649).

On or about August 7, 2014, at Simmons' direction, Ms. Fortino transferred $3,850,000 to an account maintained by Mind The Gap, LLC ("MTG"), an entity wholly owned and completely controlled by Simmons, allegedly for the purpose of investing such funds on the Sentinel platform. (*See* Verified Ancillary Pet. Claim, filed in *United States of America v. Simmons*, 17-CR-127 (KWM), verified by Ms. Fortino (the "Verified Ancillary Petition") ¶¶3, 7(a), A-651-58 (verifying that Simmons was the sole person with access to and control over the MTG bank account); Fortino Tr., at A-622(24)-625(15)). "MTG's bank account had a $0

17

beginning balance in August 2014." (Verified Ancillary Pet. ¶7(a), A-653). On August 21, 2014, Ms. Fortino transferred an additional $2,100,000 to MTG at Simmons direction. (*Id.*). On August 11, 2014, MTG transferred $700,000 directly to Varacchi's personal Bank of America account. Immediately thereafter, on August 13, 2014, Varacchi paid $620,089.47 to the Internal Revenue Service from his personal Bank of America account. (A-665-66; Fortino Aff. ¶¶19-20, A-355-58; Fortino Tr., at A-628(8)-629(16)).

On September 3, 2014, MTG transferred $4,000,000 to Sentinel's Bank of America account. (A-672; Fortino Aff. ¶20, A-358; Fortino Tr., at A-630(4-16)). Consistent with Ms. Fortino's Proof of Claim, the $4,000,000 transfer by MTG to Sentinel on September 3, 2014 was the only transfer from MTG to Sentinel. Ms. Fortino never sent any funds directly to Sentinel, Radar LP or Radar SPC. (Fortino Tr., at A-626(20)-627(3)).

Simmons used $1,250,000 of the $5,950,000 Ms. Fortino transferred to the MTG bank account for his personal benefit, including to fund the purchase of a $700,000 house in Wilton, Connecticut. (Verified Ancillary Pet. ¶7(b) & (c), A-653-54; Fortino Tr., at A-630(17-25)).

## B. Transfers from Sentinel to MTG for Ms. Fortino's Benefit

Beginning in October, 2014, and continuing through December, 2016, Sentinel made various transfers totaling $2,510,450 to MTG on account of the

$4,000,000 invested by MTG with Sentinel. (A-675). Ms. Fortino claims to have

directly received only $662,000 of the $2,510,450 transferred to MTG by Sentinel

on account of her investment, with the remainder of the funds stolen by Simmons.

There was no evidence before the district court showing, or even tending to show,

that the Defendants had any knowledge of what was done with the $2,510,450

transferred to MTG on account of Ms. Fortino's investment.

### C.    The Continuation of the Agency Relationship

Ms. Fortino executed a second investment management agreement with

Sideris effective June 15, 2016 (the "June 2016 IMA"). The June 2016 IMA is

between Ms. Fortino, as the defined Client, and Sideris, as the defined Investor. The

June 2016 IMA is signed by Ms. Fortino and Simmons on behalf of Sideris, but is

not signed by Varacchi. (A-677-84). Simmons, through his wholly owned entity

Sideris, served as Ms. Fortino's investment advisor pursuant to both the IMA and

June 2016 IMA, and Ms. Fortino wrote three checks to Sideris totaling $7,500 for

investment advisory services. (A-686-88).[7]

Ms. Fortino knew that Simmons was making investment decisions on her

behalf, and she authorized him to make those decisions. (Fortino Tr., at A-632(1)-

634(16)). Ms. Fortino acknowledged her investment in Sideris in an August 1, 2016,

---

[7] The Apr. 9, 2015 check, (A-688), is drawn from an account with a Power of Attorney ("POA").
Ms. Fortino testified that the POA, Keeley C. Kriskey, provides Ms. Fortino with bill paying
services.

19

email to Simmons: "I know I know. I am invested in Sideris which is u . . ." (A-690-92). Simmons represented to Ms. Fortino that he was investing some of her monthly IMA and June 2016 IMA returns in stock of closely held companies, such as Kizzang and Stereocast. (Fortino Tr., at A-632(1-11)).

On August 12, 2016, Simmons sent an email to Ms. Fortino stating:

Attached please fine (sic) your monthly statement:
Monthly breakdown as follows:
Monthly interest: $73,750.00
Cash distribution: $45,000.00
Purchase of 10,000 Stereocast Series A shares at $1/share: $10,000.00
Holdback for quarterly tax payments: $10,750.00
Balance for liquid cash holdings: $8,000
The private equity holdings are being transferred over in your name as discussed: . . .

(A-694; *see also*, Fortino Tr., at A-632(1)-634(16); A-690 (asking Simmons what kind of investment her money is being used for other than "kizzang and Stereocast")). Ms. Fortino received the $45,000 distribution referenced in Simmons' August 12, 2016, email on or about August 15, 2016 (the funds were wired to Ms. Fortino from the MTG account on August 15, 2016). (A-696).

Ms. Fortino received monthly distributions from the MTG account. (Fortino Tr., at A-633(22-25)). Ms. Fortino never received a distribution of funds directly from the Receivership Entities.

20

### D.     Sideris Paid Income Taxes on Ms. Fortino's Behalf

Ms. Fortino's investment advisor, Simmons through Sideris, began making state and federal income tax payments on Ms. Fortino's behalf in September 2014. (A-704 (noting that Ms. Fortino's Sept. 15, 2014 Connecticut State tax payment was "Paid by Sideris Capital per Neila's email.")). On December 29, 2015, Ms. Kriskey sent an email to Ms. Fortino, copying Mr. Simmons, with the subject line: "Estimated Income Tax Payments." In the email, Ms. Kriskey reminds Ms. Fortino that "[p]er your standing instructions, Steve [Simmons] has been paying your estimated income tax payments each quarter." (A-706).

In a series of text messages in early February 2017, Ms. Fortino stated to Mr. Simmons: "I need to know immediately if u paid the quarterly tax estimate due in 1/15/17????? Like Now." (A-708). In response to Mr. Simmons's text that "Nothing has been made for 2017," Ms. Fortino stated, "60,700 federal and 13,000 Ct." (*Id.*, A-708-09). In total, Simmons and Sideris paid $387,182 in tax payments on Ms. Fortino's behalf. (A-699-704).

### SUMMARY OF THE ARGUMENT

Consistent with the Claim Calculation Methodology previously ordered by the district court and applied to all other claimants, the Receiver proposed and the district court determined Flatiron's claim against the receivership estate by taking the total transfers made by Flatiron to the Receivership Entities and subtracting the

21

total transfers Flatiron had received from the Receivership Entities in return. Consistent with the Rising Tide Method for determining the percentage distributions to be made by the Receiver from the receivership estate, Flatiron's pre-receivership percentage recovery was also determined by dividing the aggregate of transfers received from the Receivership Entities by Flatiron by the aggregate of transfers made by Flatiron to the Receivership Entities—the same manner as every other claimant in the receivership proceeding. It is a fundamental principle in receivership proceedings **not** to look to any party's characterization or intent in connection with such transfers. To the extent there is any issue of interpretation with respect to the district court's prior Plan Approval Order (which is not the subject of this appeal) including the Plan Methodologies, the Receiver respectfully submits that this Court should extend substantial deference to the district court for its understanding.

The Receiver similarly proposed and the district court applied these methodologies to Ms. Fortino's claim. Money in minus money out. The only difference is that Ms. Fortino had an intermediary make her investments and receive transfers in return on her account. There is no dispute that such an agency relationship existed. Ms. Fortino for the first time now argues in this appeal that the "adverse interest exception" to the agency imputation rule should apply. Ms. Fortino never argued this defense and submitted no evidence to the district court to establish its essential factual elements, and the district court necessarily did not adjudicate its

applicability. Ms. Fortino cannot, therefore, rely upon it to establish the basis for the reversal of the District Court Decision determining her claim in accordance with the Claim Calculation Methodology and the Rising Time Method of distribution. Moreover, her claim in the receivership is for restitution and, as such, cannot exceed the extent to which the Receivership Entities retained her transfers.

## STANDARD OF REVIEW

After what essentially constituted a bench trial conducted in accordance with the previously ordered summary procedures, the district court entered the District Court Decision adjudicating the Claimants' claims against the receivership estate. Under these circumstances, the standard of review is *de novo* for conclusions of law and the application of the law to the facts, *see, e.g., Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 617-18, 623 (2d Cir. 2006), and clearly erroneous with respect to the district court's findings of fact. Fed. R. Civ. P. 52(a)(6); *see also Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574. As trier of fact, the judge is "entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (internal citations omitted).

While Flatiron correctly points out that an appellate court "review[s] the District Court's decision relating to the choice of a distribution plan for the receivership estate for abuse of discretion," (Flatiron Appellant Br. at 14 (citation omitted)), Flatiron has not appealed from (and does not oppose the application of the principles set forth in) the Plan of Distribution. Instead, Flatiron appeals from the district court's adjudication of its claim.

Since the district court, in adjudicating the Claimants' claims, applied the Claim Calculation Methodology and Rising Tide Method of distribution approved and authorized by its Plan Approval Order, that court is best situated to interpret its own order. The Receiver respectfully submits that this Court should give the district court's interpretation of its own order substantial deference. *See Boucher Imps., Inc. v. Old Carco LLC (In re Old Carco LLC)*, 438 Fed. Appx. 30 (citing *In Re Casse*, 198 F.3d 327, 333 (2d Cir. 1999)).

## ARGUMENT

## I. The District Court Correctly Applied the Plan Methodologies to Flatiron's Claim

### A. The Plan Methodologies Take into Account All Transfers Between the Receivership Entities and the Claimant

The Motion for Plan Approval unequivocally explains that the Claims Calculation Methodology "determines the Allowed Amount of each investor claim by aggregating the amounts deposited by the investor with the Receivership Entities

24

and then subtracting from that total all transfers such investor received from the Receivership Entities . . . ." (Mot. for Plan Approval ⁋49, A-126). The proposed, and subsequently approved, Claims Calculation Methodology takes into account "funds actually deposited or paid by [an] investor to the Receivership Entities," and funds "actually received" by an investor from the Receivership Entities. (*Id.* ⁋57, A-128-29). The Claims Calculation Methodology treats all transfers to and from a claimant the same "regardless of whether distributions were characterized as interest, earnings, returns of principal or capital, or otherwise." (*Id.* ⁋44, A-125).

Moreover, in furtherance of the principle that "equality is equity," *SEC v. Wealth Mgmt.*, 628 F.3d at 333, the Receiver recognized that distributions from the receivership estate should take into account pre-receivership recoveries received by the claimants in order to equalize the overall recovery (on a percentage basis) realized by all claimants including those to be made subsequently by the Receiver from the receivership estate. (Mot. for Plan Approval ⁋91, A-140). Accordingly, the Receiver proposed and the district court approved a *pro rata* distribution plan based on the Rising Tide Method of distribution. (*Id*. ⁋102, A-144; Plan Approval Order ⁋6, A-190-91).

"Rising tide appears to be the method most commonly used (and judicially approved) for apportioning receivership assets." *SEC v. Huber*, 702 F.3d 903, 906 (7th Cir. 2012) (collecting cases). Under the Rising Tide Method, "[p]ayments

25

received by the investor prior to the scheme's collapse are treated as 'distributions' on par with the distributions to be made by the Receiver, so that prior amounts paid by [the receivership entity] are credited against (i.e., subtracted from) the amount that would otherwise be paid from the receivership estate." *SEC v. Parish*, No. 2:07-CV-00919-DCN, 2010 U.S. Dist. LEXIS 11757, at \*11 (D.S.C. Feb. 10, 2010); *see also Huber*, 702 F.3d at 905. The methodology simply aggregates all transfers to and all transfers from the Ponzi scheme to determine the pre-receivership recovery percentage. *See, e.g., United States CFTC v. Mason*, No. 3:13-CV-196-GCM, 2014 U.S. Dist. LEXIS 147770, at \*7 (W.D.N.C. Oct. 14, 2014) ("[T]his [Rising Tide] methodology allows the receiver to distribute based on the gross amount deposited into an account from account inception, calculating a pro rat[a] distribution amount, ta[k]ing into account all withdrawals pre-receivership treating those withdrawals as distributions and then making a payment if warranted to equal the distribution percentage, *i.e.*, this method considers the distributions over the life of the account.").

## B. The District Court Correctly Calculated Flatiron's Pre-Receivership Recovery Percentage

The district court correctly concluded that Flatiron's pre-receivership recovery percentage under the Rising Tide Method was 43.06%. Therefore, Flatiron was not entitled to receive any distribution from the Receivership Estate until all

other claimants recovered 43.06% of their claims (taking into account all pre-and post-receivership recoveries). (District Ct. Decision, SPA-2; 27).

The district court arrived at this conclusion by correctly applying the Rising Tide Method, *i.e.,* simply taking into account the gross amount of the transfers made by Flatiron to the Receivership Entities ($7,100,921) and the gross amount of transfers Flatiron received from the Receivership Entities ($3,057,931), and determining Flatiron's percentage of recovery based on a simple mathematical formula: $3,057,931 / $7,100,921 = 43.06%. In other words, once the total amounts transferred are known, Flatiron's percentage claim under the Rising Tide Method is determined based upon a simple math equation.

### C. There is No "Equitable Exception" to the Plan Methodologies and, to the Contrary, Equity Compels Their Uniform Application

Flatiron's core argument is that the district court "abused its discretion" in not resorting to "equity" to alter the "rigid" application of the Plan Methodologies. (Flatiron Appellant Br. at 1, 15-28). Flatiron's argument relies heavily on the "general equity powers" of the district court in receivership proceedings. (*Id*. at 16-19). Flatiron misses entirely that the district court exercised its equitable discretion in selecting the Plan Methodologies among other options and incorporating them into its Plan Approval Order. (Mot. for Plan Approval, A-118-24; A-136; A-139-47; Plan Approval Order ¶3 & ¶6, A-191). Flatiron did not oppose this relief at the time.

27

As explained in the preceding sections, by their very requirements, the Plan Methodologies compelled their mechanical application. Money in and money out … period. Once in place, the uniform application of the Plan Methodologies by the Receiver in his administration of the receivership estate, treatment of claims asserted by claimants, and distributions to those claimants, was not only legally required but would lead to the most equitable treatment of all claimants.

Consistent with the fundamental principle in receiverships (and other insolvency proceedings) that "equality is equity," *Wealth Mgmt.*, 628 F.3d at 333, the uniform application of the Rising Tide Method is critical to ensure the equitable treatment of claims among all claimants. Receiverships are equitable proceedings intended to treat claimants fairly, even when that results in discrete claimants recovering less than they might otherwise under an alternative plan or method of distribution. *See CFTC v. Walsh*, 712 F.3d 735, 749 (2d Cir. 2012) (rejecting claimant's argument that district court should have included a "prudence premium" for those claimants who invested in less risky assets, and noting that "[a] district court assessing a receiver's plan for compensation of victims of a fraudulent scheme has 'equitable authority . . . to treat all the fraud victims alike (in proportion to their investments) and order a pro rate distribution'") (ellipsis and parentheticals in original, citations omitted). Disregarding Flatiron's initial $2 million transfer in and $2 million transfer out would be highly inequitable and unfair to other similarly

28

situated claimants who had all of their transfers to and from the Ponzi scheme considered in determining their pre-receivership recovery percentage pursuant to the Rising Tide Method.

It is axiomatic that "a primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *SEC v. Hardy*, 803 F.2d 1034, 1038, (9th Cir. 1986) (citations omitted). Flatiron asks this Court to adopt a procedure under the guise of "equity" that would require receivers and district courts to examine the circumstances surrounding each claimant's transfers to make some amorphous and highly subjective "fairness" assessment and modify the allowance and distribution methodologies accordingly. Such an approach would require substantial additional undertakings by receivers, invite a plethora of litigation thereby further limiting scarce judicial resources, and drain the receivership estate of the very assets that are intended to be distributed to victims of fraud. *See id.*, at 1038-39 (". . . a district court in overseeing a receivership must 'make rules which are practicable as well as equitable'") (citation omitted). Determining every claimant's Rising Tide percentage claim in the same manner without regard to each claimant's unique circumstances—as the Receiver and district court have done in this case—is both practicable and equitable.

Flatiron contends that the district court's determination of its claim punishes it because it is a victim of Varacchi's fraud. Flatiron is not being punished; its claim

has been determined in the same manner as every other claimant who are all victims of fraud. Moreover, Flatiron had an opportunity to cease conducting business with Varacchi in February 2015 after the $2 million transfer to it, and based on everything it knew in January and February 2015 it should have ceased conducting business with him. Instead, Flatiron choose to transfer $2 million to Radar LP in March 2015, no doubt in large part because Mr. Crawford received a $22,132.45 payment from Varacchi on February 20, 2015, even though Flatiron had yet to conduct a single trade on the Sentinel platform and had not earned the $22,132.45 payment through trading profits or otherwise. (*See* District Ct. Decision, SPA-8).

### D. The Maximum Balance Approach Should Not Apply

As the district court recognized, (*see* District Ct. Decision, SPA-25-26), Flatiron essentially argued that rather than applying the Rising Tide Method, the "maximum balance" approach ("Maximum Balance Approach") should apply to its claim. Apparently acknowledging that this position is untenable since it did not oppose and the district court had previously approved the Rising Tide Method, Flatiron attempts to argue on appeal that it only seeks to apply—and the Seventh Circuit's decision in *Huber* supports applying—the Rising Time Method in a non-"rigid" manner. To the contrary, *Huber* clearly distinguishes the Maximum Balance Approach and ultimately affirms the district court's approval of the distinct

30

methodology, the Rising Time Method, in the underlying receivership. 702 F.3d at 907-09.

*Huber* involved a receivership proceeding which arose out of a Ponzi scheme operated by William Huber. Eleven of the claimants "had withdrawn portions of their investment from Huber's funds before the scheme was exposed." *Id*. at 904. The other 107 claimants had not received anything from the Ponzi scheme. *Id.* The receiver proposed and the district court ordered the application of the Rising Tide Method of distribution to take into account the recoveries realized by the eleven fortunate claimants. These eleven claimants appealed and argued that they should not be penalized for having withdrawn some money from the Ponzi scheme. *Id.* at 906.

The appeal did not in any way involve the issue of pre-receivership reinvestments. Notwithstanding, in writing the opinion for the court, Judge Richard Posner in *dicta* contemplated such possibility:

> We are given pause, however, by the situation of an investor who having withdrawn some money from the Ponzi scheme then reinvests it. Suppose he had initially invested $150,000 and then, shortly after withdrawing $50,000, he reinvested it, thus restoring his balance to $150,000, all of which he lost when the scheme collapsed.

*Id.* at 907. Judge Posner specifically noted the result ***compelled*** by the Rising Tide Method:

31

> Under the rising tide method he would be credited with having invested $200,000 ($150,000 plus $50,000) and having recouped a quarter of that amount by his withdrawal, and thus would receive a reduced share of recovered assets compared to a person who had invested $150,000 and lost it without any interim withdrawals.

*Id*. Judge Posner questions this difference:

> We can't see why those two investors should be treated differently, as would be obvious if the withdrawal and reinvestment had occurred on successive days.

*Id*.[8] *But see SEC v. Coadum Advisors, Inc.*, No. 1:08-CV-11-ODE, 2009 U.S. Dist. LEXIS *18-19 (N.D. GA, Sept. 24, 2009) (rejecting argument that Rising Tide Method was unfair to investors who received a return and then reinvested the return because those investors had the opportunity to make the decision to reinvest, and choose to do so, whereas investors that did not receive returns had no opportunity to make such a choice). Judge Posner then noted the possibility of an ***alternative*** methodology:

> In cases of withdrawal followed by reinvestment, the investor's maximum balance in the Ponzi scheme ($150,000 in our example) should be treated as his investment; the withdrawals, having in effect been rescinded, should be ignored.

*Id*. Judge Posner then concluded as follows: "Or so it seems to us; we can't find any discussion in case law or any commentary of this 'maximum balance' approach." *Id*. at 907-08. "We needn't pursue the issue." *Id*. at 908.

---

[8] Both Flatiron and the district court below recognized this discussion to constitute *dicta*. (*See* District Ct. Decision, SPA-23).

As the Receiver explained to the district court, Flatiron is not the only claimant who reinvested funds. Consequently, the application of the Maximum Balance Approach to all claimants uniformly would alter the recovery percentage of at least five claimants (including Flatiron). (*See* A-962-63). But the Receiver has already made two interim distributions employing the Rising Tide Method, with the second occurring in January 2020. (A-17, D.I. 167). The Receiver expects to make at least one additional distribution.

Since the estate's resources are limited, Flatiron's proposed enhanced distribution would come at the expense of other claimants. To ensure equality among all claimants, imposing the Maximum Balance Approach on all claimants at this time would require a significant re-shuffling of distributions (at significant administrative cost) including the possibility of disgorgement.

Flatiron is not even suggesting this. Instead, Flatiron's request would result in one methodology applying to it to its significant economic favor and another applying to everyone else—an extraordinarily inequitable result in clear violation of the "equality is equity" principle. The Rising Tide Method should apply to Flatiron in the same manner as it has been applied to all other claimants. As this Court has noted, "[w]hen funds are limited, hard choices must be made." *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 84 (2d Cir. 2006). Indeed, "where the assets of the receivership estate are insufficient to afford full

33

recovery to all victims, any given plan is likely to be viewed more favorably by certain victims than others depending on how they fare under the plan …. An equitable plan is not necessarily a plan that everyone will like." *SEC v. Credit Bancorp, Ltd.*, No. 99-CV-11395-RWS, 2000 U.S. Dist. LEXIS 17171, at *95 (S.D.N.Y., Nov. 29, 2000).

### E. The District Court Did Not and Did Not Need to Characterize Flatiron's $2 Million Transfers

Flatiron argues that "[t]reating the February 26, 2015 withdrawal as a **redemption** and the March 2, 2015 transfer as a **reinvestment** was clearly erroneous." (Flatiron Appellant Brief, at 29), (emphasis added). The district court did not so characterize the transfers and their characterization was not a basis for the district court's decision. (District Ct. Decision, SPA-25).

The district court did not treat the January 15, 2015 $2 million transfer, the February 26, 2015 $2 million transfer, and the March 2, 2015 $2 million transfer as anything other than transfers to and from Flatiron and the Receivership Entities. (*Id.*) There was no reason for the district court to characterize the transfers as anything other than transfers. In a receivership proceeding imposed upon a Ponzi scheme, the characterization of pre-receivership transfers to and from the Ponzi scheme by the parties or any particular claimant is irrelevant. Claims are calculated based on aggregate money in and aggregate money out without regard to "whether such distributions were characterized as interest, earnings, returns of principal, or capital,

34

or otherwise." (Mot. for Plan Approval ¶44, A-125). *See, also*, *Mason*, 2014 U.S. Dist. LEXIS 147770, at \*7 (pursuant to the Rising Tide Method, distributions "based on the ***gross*** amount deposited into an account from account inception, [and] calculating a pro rate distribution amount, ta[k]ing into account ***all*** withdrawals pre-receivership treating those withdrawals as distributions") (emphasis added).

## II. The District Court Correctly Applied the Plan Methodologies to Ms. Fortino's Claim

### A. Through the MTG Account, Sideris Acted as Ms. Fortino's Agent in Transferring and Receiving Funds from Sentinel

In moving for the determination of Ms. Fortino's claim, the Receiver recognized that her claim against the receivership estate arose on account of the $4 million transfer that MTG had made on her behalf to Sentinel. (Renewed Fortino Mot., A-523 ("Although Ms. Fortino never invested directly into the Receivership Entities, her claim is based upon the transfer originally made by the intermediary, [MTG] …. The Receiver has confirmed that MTG, in fact, made these investments on Ms. Fortino's behalf.")). The Receiver learned that Ms. Fortino had entered into the Fortino IMA with Sideris and that "Ms. Fortino knew that Simmons was making investment decisions, or at least purporting to make investment decisions, on her behalf, and she authorized him to make those decisions." (*Id*., A-529-31). Sideris and Simmons had instructed her to deposit with MTG the funds she intended to invest. (Verified Ancillary Pet. ¶3, A-652).

In accordance with the Claim Calculation Methodology, the Receiver then deducted the transfers made by the Receivership Entities to MTG on Ms. Fortino's behalf totaling $2,510,450 from the $4 million initial transfer MTG had made to Sentinel. The Receiver concluded that, "[t]o the extent Ms. Fortino seeks to step into the shoes of MTG and assert the claim arising from the $4 million transfer made by MTG, she should take the claim burdened by the returns paid on account of that investment to MTG." (Renewed Fortino Mot., A-540). Accordingly, the Receiver proposed that Ms. Fortino be allowed a claim in the amount of $1,489,550, and a pre-receivership recovery percentage of 62.76%.

Ms. Fortino opposed the Receiver's proposed allowance of her claim and pre-receivership recovery percentage based upon the argument that she had only "actually received" $662,000 on account of her investment in the Receivership Entities. (Fortino Opp. to Renewed Fortino Mot., A-831-32).[9] This amount apparently reflected the aggregate amount that Sideris and Simmons had actually paid back to her personally. In accordance with the summary procedures, the

---

[9] In a footnote, Ms. Fortino also argues that the $700,000 that MTG had transferred to Varacchi personally should have been included as part of her claim against the receivership estate. (Fortino Appellant Br. at 12 n.5). She advances this argument based upon the application of a particular legal principle, but does not explain how she reaches this conclusion. The argument has been, therefore, waived. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 76 (2d Cir. 2001) (holding an argument was waived because it "appears ... only in a footnote stating the proposition conclusorily in a single sentence"). Moreover, the Claims Calculation Methodology only takes into account transfers received by the Receivership Entities (which does not include Varacchi personally). (*See* Mot. for Plan Approval ¶49, A-126 ("amounts deposited by the investor with the Receivership Entities")).

Receiver conducted discovery and then filed his Renewed Fortino Motion on January 15, 2021, which included his memorandum of law and twenty exhibits submitted therewith. On March 15, 2021, Ms. Fortino filed her opposition which included her memorandum in opposition, her affidavit, and the affidavit of her counsel along with various exhibits. The Receiver thereafter filed his reply. The district court then conducted a hearing and heard oral argument.

In its District Court Decision, the district court correctly concluded that the transfers between MTG and Sentinel were made and received on behalf of Ms. Fortino. (District Ct. Decision, SPA-2; SPA-17). Indeed, the only funds that MTG ever provided to Sentinel were Ms. Fortino's and the only basis for Sentinel to provide funds to MTG was a return on Ms. Fortino's $4 million. Thus, the $2,510,450 transferred from Sentinel to MTG was, in fact, "actually received" by Ms. Fortino through her agent and her claim against the receivership was reduced by that amount. (*Id.*, SPA-17 ("[F]unds received by Mr. Simmons, who Ms. Fortino understood to be Sideris, ... as Ms. Fortino's agent, also were received by Ms. Fortino, as '[p]ayment to an agent constitutes payment to a principal'") (quoting *Gordon v. Tobias*, 262 Conn. 844, 849 (2003)).

## B. Ms. Fortino Did Not Assert or Attempt to Prove and, Therefore, Waived Any Adverse Interest Exception Defense

Ms. Fortino does not dispute that Sideris and Simmons through MTG acted as her agent. Instead, Ms. Fortino argues here on appeal for the first time in this

litigation that the "adverse interest exception" precluded attributing MTG's receipt of funds to her personally. By not making this argument below, Ms. Fortino waived the defense and cannot assert it as a basis on appeal to reverse the District Court Decision.

Indeed, Judge Bolden specifically asked Ms. Fortino's counsel during the hearing on the Renewed Fortino Motion whether he needed "time to respond" to the Receiver's agency argument and then directly asked counsel whether there is "a legal basis that you are aware of suggesting that the agency law that the receiver suggests is applicable here should not be applied …." (Hr'g Tr., at A-969). In response, counsel did not request additional time to address the agency issue raised by the Receiver, or identify the adverse interest exception or any other defense to the agency relationship asserted by the Receiver. (*Id.*, at A-969-70).

The presence of the adverse interest exception depends upon a fact-intensive and multi-faceted inquiry. The Connecticut Supreme Court has identified three sets of circumstances in which the typical presumption that an agent has informed his principal can be rebutted: "(1) Where it is not the duty of the agent to disclose; (2) when the agent is acting adversely to the interest of his principal, whether for the interest of himself or a third party; [and] (3) where the agent is acting in fraud of his principal." *Resnik v. Morganstern*, 100 Conn. 38, 43, 122 A. 910, 911 (1923) "When an agent, by his self-serving conduct, so abandons his principal's interests as to act

38

adversely to those interests, or worse, to act in fraud of his principal, it can fairly be said 'that, pro tanto, the agency really cease[s].'" *Reider v. Andersen*, 47 Conn. Supp. 202, 210 (2001) (quoting *Resnik*, 100 Conn. at 44). The question, then, is to what extent must an agent "so abandon his principal's interest" to relieve the principal of agency imputation? It does not appear that this issue has been specifically addressed by the Connecticut Supreme Court.

Courts in other jurisdictions have considered the extent of an agent's abandonment required to rebut the presumption of imputation to the principal. "Total abandonment is the approach taken by the majority of jurisdictions that have considered the extent of adversity required under the adverse interest rule." *Anderson v. Meyers (In re Infinity Bus. Grp., Inc.)*, 612 B.R. 76, 131 (D. S.C. 2019) (citations omitted). Although "an agent's action may provide a clear personal benefit to the agent, the key inquiry under the total abandonment standard is whether the principal received any benefit, however minor, from the agent's conduct." *Id*. at 133 (citation omitted). "Courts also disagree as to whether an agent's subjective motivation should factor into the determination of whether the agent totally abandoned its interest to the … principal." *Id*. at 144. The principal asserting the adverse interest exception bears the burden of proving it. *Tobacco Tech., Inc., v. Taiga Int'l N.V.*, 388 Fed. Appx. 362, 373 (4th Cir. 2010) (citation omitted).

39

Ms. Fortino never asserted and never attempted to prove the various elements of the adverse interest exception, including whether Simmons' abandonment was sufficient to constitute total abandonment. Without notice of the contention, the Receiver never sought discovery concerning the matter and never offered any evidence to disprove its components.[10] Necessarily then, the district court never decided whether the adverse interest exception applied to defeat the effect of the agency relationship. Consequently, Ms. Fortino waived the argument that the adverse interest exception applies and cannot assert it now on appeal. *Manhattan Enter. Grp., LLC v. Higgins*, 816 Fed. Appx. 512, 515 (2d. Cir. 2020) (citations omitted); *Aiello v. Stamford Hosp.*, 487 Fed. Appx. 677, 678 (2d. Cir. 2012); *Fisher v. Vassar College*, 70 F.3d 1420, 1452 (2d Cir. 1995).

### C. Ms. Fortino's Claim Cannot Exceed the Amount Retained by Sentinel

There is no dispute that MTG transferred $4 million to Sentinel and that Sentinel transferred $2,510,450 back to MTG on account of the $4 million transfer. Because claims against a receivership estate of a Ponzi scheme are in the nature of restitution and are not meant to compensate the victims for their actual loss, Ms. Fortino's claim cannot exceed the extent she had enhanced the Receivership Entities.

---

[10] The Receiver offered evidence showing that Simmons, through MTG, had returned $662,000 to Ms. Fortino and that Simmons had paid $337,182 of Ms. Fortino's income tax obligations. The Receiver did not offer evidence of either of these facts to rebut an unpled defense, but both facts do show that Simmons was not acting totally adverse to Ms. Fortino's interests.

Sentinel's unjust enrichment equals the net difference in the transfers or $1,489,550, as proposed by the Receiver and argued to the district court in the prosecution of the Renewed Fortino Motion. (District Ct. Decision, SPA-12-13).

As explained by the Receiver in his Motion for Plan Approval, the Claim Calculation Methodology:

> [S]tems from the universally accepted conclusion that by "investing" in a Ponzi scheme "even unwittingly, a person does not – strictly speaking – provide 'value'". *Armstrong v. Collins*, 2010 U.S. Dist. LEXIS 28075, at *67-69 (S.D.N.Y. Mar. 24, 2010). "This is because the money invested simply perpetuates the debtor's fraudulent scheme: 'the longer a Ponzi scheme is kept going the greater the losses to the investors.'" *Id.* (quoting *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995)).

(Mot. for Plan Approval ¶50, A-126). Consequently, as further stated in the Motion for Plan Approval:

> Investors cannot retain profits received from a debtor engaged in a Ponzi scheme because, as explained by Judge Posner,
>
>> The paying out of profits to [the Ponzi scheme investor] not offset by further investments by him conferred no benefit on the corporations [involved in the Ponzi scheme] but merely depleted their resources faster.
>
> *Scholes v. Lehmann*, 56 F.3d at 757; s*ee also Sagor v. Picard* (*In re Bernard L. Madoff Inv. Sec., L.L.C.*), 697 F. App'x 708, 713 (2nd Cir. 2017) (refusing to "treat[] fictitious and arbitrarily assigned paper profits as real" and to give "legal effect to [the fraudster's] machinations." (citations omitted)); *Trs. of the Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 568 15 (2nd Cir. 2016) (a "court of equity will not lend its power to assist or protect a fraud.").

(*Id.*).

41

Notwithstanding, claimants hold a claim against the Ponzi scheme perpetrator and, by extension, the receivership estate appointed over it, based on restitution. Pre-receivership distributions made by the Ponzi scheme may be retained up to the principal amount invested:

> [C]ourts have held "that a defrauded investor in a Ponzi scheme gives value to the debtor in the form of a dollar-for-dollar reduction in the investor's restitution claim against the Ponzi scheme." *Jobin v. Ripley* (*In re M&L Bus. Mach. Co.*), 198 B.R. 800, 810 n.4 (D. Colo. 1996) (collecting cases); *see Donell v. Kowell*, 533 F.3d 762, 771 (9th Cir. 2008); *Jordan v. Kroneberger* (*In re Jordan*), 392 B.R. 428, 442-43 (Bankr. D. Idaho 2008).

(*Id*. ¶51, A-127).

After explaining the inter-relationship of these principles with the laws governing fraudulent conveyances and, in particular, Connecticut's Uniform Fraudulent Transfer Act, Conn. Gen. Stat. § 52-552 *et. al* ("CUFTA"), the Receiver concluded that:

> Accordingly, assuming an investor satisfies the condition of good faith, their deposited "investment" creates a restitution claim in their favor against the receivership entities. Pre-receivership payments from the receivership entities to an innocent investor—whether characterized as interest, profits, gains, or otherwise—satisfy the requirement of "reasonably equivalent value" under CUFTA since such payments amount to a dollar-for-dollar reduction of that investor's restitution claim (partial satisfaction of antecedent debt). *See Armstrong*, 2010 U.S. Dist. LEXIS 28075, at *67-69 (citing, *inter alia*, *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995)).

(*Id*. ¶55, A-127-28).

42

Restitution entitles the victim to recover the benefit unjustly received by the wrongdoer, rather than compensation for the victim's loss. As the Connecticut Supreme Court explained in *New Hartford v. Connecticut Res. Recovery Auth.*, 291 Conn. 433, 460, 970 A.2d 592, 614 (2009), "[d]amages are intended to provide a victim with monetary compensation for an injury to his person, property or reputation . . . whereas restitution aims to deprive a defendant of unjustly obtained benefits." (Citation and internal quotation marks omitted). *See also id*. ("The restitution claim stands in flat contrast to the damages action…. The damages recovery is to compensate the plaintiff, and it pays him… for his losses. The restitution claim, on the other hand, is not aimed at compensating the plaintiff, but at forcing the defendant to disgorge benefits that it would be unjust for him to keep.") (citing D. Dobbs, Remedies (1973) § 4.1, p. 224.); *id*. ("[T]he money recovery called damages is based upon the plaintiff's loss, and in that respect stands in bold contrast to the money recovery called restitution, which is based upon the defendant's gain.") (citing D. Dobbs, *supra*, § 3.1, p. 137).

The gain received by Sentinel on account of Ms. Fortino's funds is measured by the net amount retained—transfers received minus transfers made. Sentinel's distributions to MTG diminished the gain Sentinel had received from MTG. The receivership estate should not be compelled to disgorge the amounts Sentinel already transferred to MTG prior to the receivership. It only needs to disgorge—as reflected

43

in the allowed amount of Ms. Fortino's claim—the amount ultimately retained by Sentinel: $1,489,550. That is precisely the extent of Sentinel's unjust enrichment.

This analysis matches perfectly with the application of the Claims Calculation Method as otherwise employed by the Receiver in this receivership proceeding. Equality is equity. While the Receiver acknowledges that certain claimants, including Ms. Fortino, are victims of both Varacchi and Simmons, the Receiver has not been appointed to administer their assets and liabilities. Rather, the Receiver was specifically appointed to "assume control of, marshal, pursue, and preserve the [assets of the Receivership Entities] with the objective of maximizing the recovery of assets, and, to the extent that assets recovered are inadequate to make defrauded investors whole, ensuring that the distribution of those assets is as just and equitable as practicable." (Receivership Orders ⁋2, A-41; ⁋2, A-101). Assuming liability for Simmons' fraud would expand the scope of the receivership beyond that prescribed in the district court's Receivership Orders, and would thereby reduce the funds available for distribution to investors who made transfers to the Receivership Entities.

Further highlighting the appropriateness of distinguishing between the Receivership Entities, on the one hand, and Sideris, Simmons and MTG, on the other, Ms. Fortino has separately pursued claims against Simmons, Sideris and MTG, and obtained a judgment against them in the amount of $5,950,000. (District

Ct. Decision, SPA-20 (citing Connecticut Superior Court docket no. FST-CV17-5016473-S)). Ms. Fortino has also successfully enforced her interest in real property purchased by Simmons with her money in Simmons' criminal proceeding by her Verified Ancillary Petition, which requested and obtained priority over the forfeiture sought by the United States of America, and Simmons' spouse. (*See United States of America v. Simmons*, 17-CR-127 (KWM) (SDNY), at D.I. 238).

Ms. Fortino, obviously, is perfectly within her rights to pursue Simmons directly to recover for the loss he caused her and to recover the proceeds of her misappropriated funds. Such liabilities and assets are beyond this Receivership Estate. Consistently, then, Ms. Fortino's claim should not depend on what was or was not returned to her personally by Simmons. Her claim against the receivership estate is measured by the funds Sentinel retained.

In sum, to the extent Ms. Fortino seeks to step into the shoes of MTG and assert the claim arising from the $4 million transfer made by MTG to Sentinel, she must take the claim diminished by the returns paid by Sentinel on account of that investment to MTG regardless of Ms. Fortino's ultimate loss.

### D. The District Court did not Consider the Effect of Tax Payments Made by Simmons on the Amount of Ms. Fortino's Claim

Having determined Ms. Fortino's claim based upon the transfers between Sentinel and her agent, Sideris through its account in the name of MTG, the district court did not need to consider whether further transfers had been made from MTG

for Ms. Fortino's benefit. In an abundance of caution, the Receiver submitted evidence showing that Simmons, through the MTG account, had paid $337,182 of Ms. Fortino's income tax obligations and that those payments were made with funds MTG had received from Sentinel on account of Ms. Fortino's investment. (*See* A-950 (describing the evidence supporting the contention that Simmons paid Ms. Fortino's income taxes with money received from Sentinel)). The district court did not address the effect of the tax payments on Ms. Fortino's claim. (District Ct. Decision, SPA 17, at n. 6).

Should this Court reverse the district court's conclusion that Sentinel's transfers to the MTG account should be attributed to Ms. Fortino, this matter should be remanded to the district court to determine the effect of these income tax payments on Ms. Fortino's claim against the receivership estate and pre-receivership distribution percentage.

## **CONCLUSION**

The district court did not err in its application of the Plan Methodologies to each of the claims asserted by Flatiron and Ms. Fortino. Therefore, the district court's July 30, 2021 Ruling and Order granting the Receiver's Renewed Flatiron Motion and Renewed Fortino Motion should be affirmed.

Respectfully submitted,

JED HORWITT, ESQ., RECEIVER

By: */s/ Stephen M. Kindseth*
Stephen M. Kindseth (ct14640)
James M. Moriarty (ct21876)
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Telephone: 203-368-4234
Email: skindseth@zeislaw.com
        jmoriarty@zeislaw.com
His Attorneys

47

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this document complies Federal Rule of Appellate Procedure 32(a) and Local Rule of Appellate Procedure 32.1 in that this document contains 10,854 words according to the word count of Microsoft Word.

Additionally, the undersigned hereby certifies that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Stephen M. Kindseth*
Stephen M. Kindseth, Esq.
(Federal Bar No. ct14640)