# 21-2245-cv(L), 21-2247-cv(CON)

## United States Court of Appeals

### *for the*

## Second Circuit

———————————◆———————————

RECEIVER JED HORWITT, ESQ.,

*Receiver-Appellee,*

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff,*

– v. –

FLATIRON PARTNERS, LP, NEILA FORTINO,

*Claimants-Appellants,*

MARK J. VARACCHI, SENTINEL GROWTH FUND MANAGEMENT LLC,
RADAR ALTERNATIVE FUND LP, RELIEF DEFENDANT, RADAR
ALTERNATIVE MASTER FUND SPC, RELIEF DEFENDANT,

*Defendants.*

—————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## REPLY BRIEF FOR CLAIMANT-APPELLANT
## FLATIRON PARTNERS, LP

THERESA TRZASKOMA
NOAM BIALE
CATHY LIU
SHER TREMONTE LLP
*Attorneys for Claimant-Appellant
  Flatiron Partners, LP*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

PRELIMINARY STATEMENT ............................................................1

ARGUMENT ...........................................................................................3

I.    The District Court Failed to Apply Principles of Equity in Its Calculation of Flatiron's Pre-Receivership Recovery Percentage .....................................3

    A.    The District Court Failed to Exercise Equity When It Applied the Rising Tide Method in a Rigid and Mechanical Way ..........................3

    B.    The District Court's Calculation Method Is Inequitable Because It Distorted Flatiron's Pre-Receivership Recovery Percentage and Prevents Flatiron from Receiving a Distribution ................................11

    C.    The District Court Erred by Misconstruing Flatiron's Request to Apply the Rising Tide Method Equitably as a Request to Apply a Different Distribution Methodology ...................................................15

II.   The District Court's Calculation of Flatiron's Pre-Receivership Recovery Percentage Relied on Clearly Erroneous Factual Findings...........18

CONCLUSION .....................................................................................19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cunningham v. Brown*,
265 U.S. 1 (1924)..........................................................................................10

*Holland v. Florida*,
560 U.S. 631 (2010)....................................................................................5, 9

*New Hampshire v. Maine*,
532 U.S. 742 (2001).........................................................................................7

*S.E.C. v. Huber*,
702 F.3d 903 (7th Cir. 2012) .................................................................. 15, 16

*S.E.C. v. Malek*,
397 F. App'x 711 (2d Cir. 2010) ....................................................................3

*S.E.C. v. Manor Nursing Ctr. Inc.*,
458 F.2d 1082 (2d Cir. 1972) .........................................................................5

*S.E.C. v. Wang*,
944 F.2d 80 (2d Cir. 1991) .............................................................................3

*S.E.C. v. Wealth Mgmt. LLC*,
628 F.3d 323 (7th Cir. 2010) .......................................................................10

**Other Authorities**

18 Wright & Miller, Fed. Prac. & Proc. § 4477 (1981).............................................7

ii

## <u>PRELIMINARY STATEMENT</u>

Claimant-Appellant Flatiron Partners, LP ("Flatiron") respectfully submits this reply brief in further support of its appeal. The district court (Hon. Victor A. Bolden, *Judge*) erred in holding that Flatiron's pre-receivership recovery percentage for purposes of the Rising Tide Method was 43.06%, rather than 20.74%. None of the arguments made by Appellee Jed S. Horowitz, Esq. (the "Receiver") undermine that contention.

The Receiver spends the bulk of his brief arguing that the district court's calculation was correct because the uniform and mechanical application of the Rising Tide Method was "legally required." Opp'n 28.[1] That is legally wrong. As a court sitting in equity, the district court was instead required to ensure the fairness of its distribution plan by applying any chosen methodology flexibly and with consideration of individual facts and circumstances. Contrary to the Receiver's argument, the district court's obligation to exercise its equitable power did not end upon the selection of the distribution plan. Notably, neither the Receiver nor the district court observed any such limitation in the proceedings below, as the district court *did* review the application of the Rising Tide Method to each claim where the claimant lodged an objection. In so doing, the district court was also required to

---

[1] Flatiron's opening brief is referenced herein as "Br." And the Receiver's opposition brief is referenced as "Opp'n." The Joint Appendix is referred to as "JA."

ensure that its factual conclusions were based on a fair assessment of the record evidence.

Moreover, the Receiver does not dispute that the district court's rigid application of the Rising Tide Method deprived Flatiron of any recovery, despite being one of the largest victims of the Ponzi scheme. And while the Receiver describes his method of calculating Flatiron's pre-receivership recovery percentage under the Rising Tide Method as "a simple math equation," Opp'n 27, he does not even attempt to argue that this equation reflected economic reality. The Receiver cannot argue that the district court's ruling was equitable as to Flatiron or based on a fair assessment of the evidence. Consequently, the district court abused its discretion by failing to exercise equity in its application of the Rising Tide Method to Flatiron's claim, and it compounded this error by relying on clearly erroneous factual findings.

Nor is there any merit to the Receiver's contention that calculating Flatiron's pre-receivership recovery percentage for Rising Tide purposes by taking into account the economic reality would require a great reshuffling of the distribution plan. No other claimant – apart from co-Appellant Neila Fortino – objected to their pre-receivership recovery percentage, and Flatiron is not asking for any other claimant's percentage to be recalculated. Nor would any funds already distributed have to be disgorged.

This Court should accordingly vacate the district court's order and remand with instructions to calculate Flatiron's pre-receivership recovery percentage equitably at 20.74%.

## ARGUMENT

### I. The District Court Failed to Apply Principles of Equity in Its Calculation of Flatiron's Pre-Receivership Recovery Percentage

#### A. The District Court Failed to Exercise Equity When It Applied the Rising Tide Method in a Rigid and Mechanical Way

The Receiver does not dispute that a district court overseeing a receivership proceeding on behalf of Ponzi scheme victims functions as a court of equity. *See S.E.C. v. Malek*, 397 F. App'x 711, 713 (2d Cir. 2010) (summary order) (noting that "a federal receiver is appointed" pursuant to a district court's "broad equitable discretion"). The Receiver also does not contest that in a receivership proceeding, a district court must exercise equity to ensure that the distribution plan is fair and reasonable. *S.E.C. v. Wang*, 944 F.2d 80, 81 (2d Cir. 1991) (noting that a plan of distribution is reviewed under a "court's general equitable powers to ensure that it is fair and reasonable"). Finally, the Receiver does not dispute that the district court here applied the Rising Tide Method in a rigid, mechanical way, without regard to the individual facts and circumstances of claimants like Flatiron. Nor could he, since both the Receiver and the district court viewed the exercise erroneously as a simple mathematical calculation.

The Receiver argues, rather, that the district court here properly applied principles of equity by "exercis[ing] its equitable discretion *in selecting the Plan Methodologies* among other options and incorporating them into its Plan Approval Order." Opp'n 27 (emphasis added). The Receiver thus contends that a district court's exercise of equity is limited to selecting the appropriate distribution methodology and ends once the district court has done so. *See id.* at 28. Moreover, the Receiver argues that to the extent the district court can apply equity beyond selecting the methodology, the court's rigid application of the Rising Tide Method to Flatiron's claim was "legally required" and the "most equitable treatment of all claimants." *Id*. None of these arguments find support in the law or in the actual conduct of the parties in this case.

The Receiver's first argument – that the district court's exercise of equity is limited to the *selection* of the methodologies and does not extend to the *application* of these methodologies to the investors' claims – cannot be squared with fundamental principles of equity. The Receiver's suggestion that the only appropriate way to apply the selected methodologies is mechanically and without regard to the particular facts and circumstances is inconsistent with the inherent flexibility of equitable proceedings, including receivership proceedings. *See, e.g.*, *Holland v. Florida*, 560 U.S. 631, 650 (2010) ("The flexibility inherent in equitable procedure enables courts to meet new situations that demand equitable intervention,

and to accord all the relief necessary to correct particular injustices." ( internal quotation marks and alterations omitted)); *S.E.C. v. Manor Nursing Ctr. Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972) ("Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy."). Moreover, the Receiver's position is inconsistent with the procedures adopted by the district court in the proceeding below, which expressly authorized the district court to review the Receiver's application of the selected methodologies to ensure fairness.

For instance, the district court's October 4, 2018 order approving the plan of distribution allowed investors to file objections to the Receiver's application of the Rising Tide Method within twenty-one days of the filing of a Notice of Interim Distribution. JA 195. After receiving an objection, the Receiver could file a Claim Determination Motion to seek the court's review of his application of the Rising Tide Method to the objecting investor's claim. *See* JA 319, 723. Similarly, the court's July 31, 2017 Claims Procedure Order expressly permitted the Receiver to file a Claim Determination Motion to seek the court's review of his application of the Claims Calculation Method to a particular claim. *See* JA 78. These procedures confirm that ensuring the equitable application of the selected methodologies is part-and-parcel of the district court's duty to ensure a fair and reasonable distribution plan.

Consistent with those procedures, in the proceedings below the Receiver proposed the claim determination procedures and asked the court to adopt them, acknowledging that the district court's equity jurisdiction extends to review the application of the methodologies. *See* JA 61, 152. The Receiver also availed himself of these procedures on multiple occasions, including by filing the Claim Determination Motions giving rise to this instant appeal. *See* JA 319, 519, 723. Before making the initial distribution, the Receiver also expressly sought the court's approval of the methodologies *and his application of the methodologies to the victims' claims*. *See* JA 147 ("[T]he Receiver recommends that this Court adopt and approve the Receiver's *application* of the Rising Tide Method as outlined in the Proposed Interim Distribution . . . ." (emphasis added)); JA 125–26 ("Based on the Receiver's *application* of the Claim[s] Calculation Method and the legal and equitable principles explained herein, the Receiver here seeks this Court's order *allowing those particular Claims in the corresponding amounts* set forth in Exhibit A submitted herewith." (emphases added)). The district court approved the methodologies and the Receiver's application, which allowed the Receiver to proceed with making the initial distribution. JA 191. It is no wonder, then, that it is for the first time on appeal that the Receiver claims that the district court's equitable authority was limited to approving the Rising Tide Method, after which claims could be evaluated only in a rigid and mechanical manner. That position is incompatible

6

with the procedure the Receiver advocated for and then undertook. *See New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) ("[A]bsent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." (quoting 18 Wright & Miller, Fed. Prac. & Proc. § 4477, p. 782 (1981)).

The Receiver's position also cannot be reconciled with the flexible manner in which the Receiver applied the Claims Calculation Method. In his brief on appeal, the Receiver characterizes the Claims Calculation Method as a math equation that involves "aggregating the amounts deposited by the investor with the Receivership Entities" and "subtracting from that total all transfers such investor received from the Receivership Entities." Opp'n at 24–25 (citation omitted). However, this characterization wholly ignores the various "equitable principles" that were incorporated into the methodology, including a "good faith" requirement, which disallowed claimants from recovering investments that were not made in good faith. JA 125, 130–33. In light of this requirement, the Receiver considered not only the amount of money transferred in and out of the Receivership Entities, as he now contends. Instead, the Receiver was required to look at the circumstances surrounding the transfers to ensure that they were made in good faith. As explained in his Motion for Approval, the Receiver "investigated whether any particular Claimant lacked good faith" and "only agreed to the proposed Allowed Claims after

he concluded that, based on the information available to him, there was no issue with the Claimant's good faith participation." JA 132. Thus, in determining the allowed amount each claimant was entitled to recover, the Receiver did not simply engage in a mathematical calculation but instead considered the context surrounding each claimant's transfers and allowed for exceptions to the methodology's requirements when it was appropriate and fair to do so.

This point is illustrated by the Receiver's treatment of a different claimant – Advanced Entertainment, LLC. Advanced Entertainment submitted a claim to recover over $3.5 million that it had transferred to the Receivership Entities. JA 168–69. But the owner of Advanced Entertainment, Joseph Meli, had used the company to run a separate Ponzi scheme involving purported resales of tickets to popular concerts and Broadway shows. *See* JA 168. The Receiver found that because the transfers were not made in "good faith," there were grounds for disallowing this claim. JA 168–69. However, recognizing that a rigid application of the Claims Calculation Method would unfairly punish investors who were defrauded by Meli, the Receiver made an exception to the "good faith" requirement and determined that this claim should be allowed, so long as the distributions would go to the investors. *Id.* The Receiver explained:

> Based upon Meli's apparent participation in the Ponzi scheme involving the Receivership Entities and, at the very least, his lack of good faith in connection with his

> transactions with the Receivership Entities, grounds exist to object to this Claim.
>
> *Notwithstanding, in furtherance of the equitable purposes of this Receivership Proceedings* [*sic*], the Receiver has sought to establish a mechanism to ensure that the victims of Meli's Ponzi scheme would receive any distributions made by the Receiver in this proceeding, as a condition to the Allowance of this Claim.

*Id.* (emphasis added.)

While the Receiver now argues that there is no "[e]quitable [e]xception" to the mechanical application of the methodologies, Opp'n 27, his treatment of Advanced Entertainment's claim indicates that exceptions to the methodologies' requirements are appropriate when the rigid application would create unfairness. Such flexibility is "inherent in equitable procedure." *Holland*, 560 U.S. at 650 (internal quotation marks omitted). And contrary to his position that the mechanical application is the "most equitable" or "legally required," Opp'n 28, the Receiver's application of the Claims Calculation Method confirms that the methodologies can, and should, be applied flexibly and with consideration of the facts and circumstances.[2]

---

[2]    Moreover, despite his professed concern that considering claimants' individual facts and circumstances would be administratively burdensome, the Receiver's flexible application of the Claims Calculation Method confirms that the equitable application of the methodologies will not jeopardize the efficient and orderly administration of the proceeding.

Finally, the Receiver repeatedly invokes the phrase "equality is equity," Opp'n 25, 28, 33, as if it is a talisman that requires mechanical application of distribution methods. But the Receiver misreads what that phrase means. Courts have cited it to support "[d]istribution of assets *on a pro rata basis*" to "investors *with substantively similar claims*," *S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d 323, 333 (7th Cir. 2010) (emphasis added), but nowhere have these courts endorsed a rigid application of a distribution method to achieve that goal. Indeed, the phrase derives from *Cunningham v. Brown*, 265 U.S. 1 (1924), the case concerning the original fraudulent scheme by Charles Ponzi. *Id.* at 7. In that case, certain claimants who had rescinded their contracts with Ponzi claimed priority over others who sought to enforce their contracts with him against the bankruptcy estate established after his fraud was uncovered. *Id.* at 9. The Supreme Court rejected that rigid distinction, holding that, as a matter of economic reality, all claimants were similarly situated. *Id.* at 13 ("Whether they sought to rescind, or sought to get their money as by the terms of the contract, they were, in their inability to identify their payments, creditors, and nothing more."). In those circumstances, the Supreme Court stated that the principle that "equality is equity" applied. *Id.* Here, by contrast, the Receiver deployed a rigid application of the Rising Tide Method to *ignore* economic reality and treat Flatiron *differently* than other claimants with which it was similarly

10

situated. The principle that "equality is equity" thus supports Flatiron's position and undercuts the Receiver's.

Consequently, the district court failed to exercise its equitable discretion when it deferred to the Receiver's rigid and mechanical application of the Rising Tide Method and failed to consider the facts and circumstances.

### B. The District Court's Calculation Method Is Inequitable Because It Distorted Flatiron's Pre-Receivership Recovery Percentage and Prevents Flatiron from Receiving a Distribution

In its principal brief, Flatiron raised several arguments demonstrating that the district court's calculation of Flatiron's pre-receivership recovery percentage as 43.06% is inequitable. Specifically, Flatiron argued that: (1) the district court's rigid calculation distorted the economic reality by inflating each side of the ledger by $2 million; (2) the inflated recovery percentage allows investors who recovered to a *greater* degree than Flatiron before the scheme's collapse to gain distribution priority over Flatiron, which undermines the equity-based objectives of this methodology; and (3) crediting the roundtrip transfers relating to the NAV calculation unfairly punishes Flatiron for having been victimized by Defendant Mark J. Varacchi. Br. 16–28. The Receiver does not meaningfully respond to any of these arguments in his opposition, but instead merely asserts that "Flatiron is not being

punished" because his claim is being "determined in the same manner as every other claimant who are all victim of fraud." Opp'n 29–30.

Flatiron of course acknowledges that other claimants are also victims of Varacchi's scheme. In light of the unique circumstances surrounding the roundtrip transfers, however, the district court's rigid, uniform treatment of the claims is precisely what makes the calculation inequitable. Specifically, the district court's calculation without regard to the facts and circumstances leads to an extremely unfair outcome: it deprives Flatiron of the opportunity to receive a distribution simply because it had been defrauded by Varacchi.[3] It is undisputed that the February and March transfers would not have occurred if Flatiron's principal, Brett Crawford, had not been manipulated by Varacchi. Email correspondence and Crawford's deposition testimony obtained from discovery confirm that Flatiron had no choice but to temporarily withdraw the initial investment in February 2015 to complete its NAV calculation because Varacchi had misappropriated Flatiron's investment and could not provide account access for weeks. JA 764–68, 790–97. After the NAV calculation was completed, Flatiron returned the funds just a few days later. *See* JA 398, 776–78. The Receiver had ample opportunity below to contest these facts – including after requesting and receiving authorization to take discovery – but he did

---

[3] The Receiver does not dispute that Flatiron will recover nothing at a pre-receivership recovery percentage of 43.06%.

not because there was no basis to do so. In light of this context, crediting these two transfers in the calculation is inequitable, as it inflates Flatiron's recovery percentage and bars Flatiron from recovering from the estate simply because it had been duped.

Despite this inequitable outcome, the Receiver suggests that it is appropriate to include these transfers in the calculation because "Flatiron had an opportunity to cease conducting business with Varacchi in February 2015" and "based on everything it knew in January and February 2015 it should have ceased conducting business with him." Opp'n 29–30. But the record refutes the suggestion that Crawford was in any way aware of the Ponzi scheme. In his deposition, Crawford testified repeatedly under oath that he was unaware of the scheme. JA 769, 774–75. That testimony was uncontroverted by the Receiver. Indeed, following the initial $2 million investment, Flatiron invested *another* $3.1 million in Radar. JA 399. Crawford himself was Flatiron's biggest investor. JA 397. Again, the Receiver contested none of this. His victim-blaming argument makes no sense given the uncontroverted facts.

The Receiver also argues that the February and March transfers should be counted in the calculation because Flatiron "cho[se] to transfer the $2 million to Radar LP in March 2015, no doubt in large part because Crawford received a $22,132.45 payment from Varacchi on February 20, 2015." Opp'n 30. That mischaracterizes the record concerning that payment. Crawford testified under oath

13

that the $22,132.45 Sentinel sent to FPLLC had nothing to do with Flatiron and did not represent trading profits or a return on Flatiron's investment. JA 398–99, 781. The Receiver did not contest or question this testimony.

The record is, in sum, completely bereft of any support for the Receiver's claim that the March 2015 transfer was a strategic reinvestment. In February 2015, Flatiron withdrew the initial refund so that its fund administrator could perform the NAV calculation. JA 398. It was understood that this withdrawal was a *temporary* refund, and Crawford had every intention of returning it at the time of the withdrawal. *Id.* Consistent with this intent, Flatiron returned the funds just a few days later. *Id.* There is no evidence to suggest that Crawford ever considered keeping the money, returning it to Flatiron's investors, or pursuing other investment options. Consequently, the record indicates that these transfers were not strategic investment decisions, but administrative transactions that, unbeknownst to Flatiron, were caused by Varacchi's fraud.

Accordingly, the district court's failure to apply equity resulted in a distorted pre-receivership recovery percentage of 43.06%, instead of 20.67%, which effectively bars Flatiron from recovering anything from the estate.

**C.** **The District Court Erred by Misconstruing Flatiron's Request to Apply the Rising Tide Method Equitably as a Request to Apply a Different Distribution Methodology**

The Receiver argues that the so-called "Maximum Balance Approach" should not apply because to apply a different methodology at this juncture "would require a significant re-shuffling of distributions (at significant administrative cost) including the possibility of disgorgement." Opp'n 33. By advancing this argument, the Receiver, like the district court below, misconstrues Flatiron's request for the equitable application of the Rising Tide Method with a request to apply a different methodology altogether.

To be clear, Flatiron has never objected to the Rising Tide Method and has always consented to its application. JA 219, 380, 929. Flatiron only requested that the Receiver and district court apply this methodology *equitably* and with consideration of the facts and circumstances. JA 384, 933. In support of this request, Flatiron cited the Seventh Circuit's decision in *S.E.C. v. Huber*, 702 F.3d 903 (7th Cir. 2012), as persuasive authority. In *Huber*, Judge Posner explained, albeit *in dicta*, that to avoid the unfairness of distorting the recovery percentage for investors who made a withdrawal followed by a re-investment in an identical amount, these "investor's maximum balance in the Ponzi scheme . . . should be treated as his investment" because "the withdrawals, having in effect been rescinded, should be ignored." *Id.* at 907. The Receiver seizes upon stray language in that explanation (as

did the district court), misconstruing this persuasive *dictum* in *Huber* as a demand by Flatiron to apply an alternative distribution methodology, the so-called "Maximum Balance Approach." Opp'n 33; *see also* SPA 25–26. But the "Maximum Balance Approach" is not a separate distribution methodology and, as noted by Judge Posner, there is no authority recognizing it as such. *Huber*, 702 F.3d at 907. Nor did *Huber* suggest that the "Maximum Balance Approach" is an alternative distribution methodology. Instead, *Huber* persuasively highlights that a rigid, money in-money out application of the Rising Tide Method can result in unfairness, and cautions that the methodology should be applied flexibly and with the ultimate goal of advancing equity. *Id.*

Contrary to the Receiver's argument, applying the Rising Tide Method in an equitable manner here would not be administratively burdensome. The Receiver suggests that if Flatiron's pre-receivership recovery percentage is adjusted, then he would also need to adjust the recovery percentage for at least four other claimants: Donald Foley and Barbara Long, Constatine Generalis, Masotti Managed Investments, LLC, and Powerplay Marketing. Opp'n 33 (citing JA 962–63). But there is no evidence in the record – and the Receiver did not attempt to introduce any – that indicates that these claimants are similarly situated to Flatiron, such that their claims should be adjusted in a similar way. Flatiron certainly never argued that any other claimant's pre-receivership recovery percentage should be recalculated

under a different methodology. *See* JA 376–86, 923–35. More important, however, none of these claimants objected to the Receiver's calculation of their pre-receivership recovery percentage, despite having multiple opportunities to do so, *see* JA 218; JA 18 (Dkt. No. 182), and also did not object to Flatiron's request for the equitable calculation of its own recovery percentage. The Receiver has proffered no reason why any of these claimants would now be permitted (years after the fact) to lodge an objection to how their claims were calculated, having declined to do so when they had the opportunity. Accordingly, adjusting Flatiron's calculation would not require the Receiver to alter the percentages for any other claimant.

Furthermore, adjusting Flatiron's recovery percentage would not, as the Receiver argues, require other claimants to disgorge their distributions or involve the reshuffling of assets. There have been two interim distributions so far and the most recent distribution "raised the tide" to 22.4%.[4] JA 17 (Dkt. No. 167). Pursuant to the parties' stipulation, JA 221, the Receiver held $84,603.47 *in reserve*, reflecting the amount Flatiron would have been entitled to based on a recovery percentage of 20.74%. If Flatiron prevails on this appeal, it will simply recover the funds held in this reserve. Under no circumstances will the Receiver be required to claw back funds distributed to the other claimants to provide a distribution to Flatiron, and any

---

[4]   Flatiron's opening brief incorrectly stated that there was only one initial distribution. Br. 33.

17

recovery on top of 22.4% would not have been distributed yet. Thus, the Receiver's suggestion that funds would be disgorged is a bugaboo with no basis in fact. Applying the Rising Tide Method equitably as to Flatiron's claim would not affect the recovery percentages of other claimants or the orderly administration of the proceeding below.

## II.    The District Court's Calculation of Flatiron's Pre-Receivership Recovery Percentage Relied on Clearly Erroneous Factual Findings

In its principal brief, Flatiron explained that the district court abused its discretion when it treated the February 2015 withdrawal as a redemption and the March 2015 transfer as a reinvestment, factual findings that are unsupported by the record evidence. Br. 29–31. The Receiver does not argue that these findings are based on a reasonable assessment of the evidence. Instead, he merely asserts that the court did not need to "characterize the transfers as anything other than transfers" because the nature of the transfers is irrelevant under the Rising Tide Method. Opp'n 34–35. However, as explained above, the district court had a duty to apply the Rising Tide Method in an equitable way, which involves examining the facts and circumstances.

As explained in Flatiron's principal brief, had the district court properly considered the context surrounding the transfers, it would have found that these two transactions were not strategic investment decisions. Instead, the district court would have concluded that the transfers were made for an administrative purpose and were

caused by Varacchi's fraud, and therefore, should have been omitted from the calculation. Br. 29–31. Consequently, the district court's calculation should be vacated for the independent reason that it relied on clearly erroneous factual findings.

## **CONCLUSION**

For the reasons set forth above and in Flatiron's principal brief, this Court should vacate the district court's order and remand with instructions to hold that Flatiron's pre-receivership recovery percentage is 20.74%.

Dated:      New York, New York
            March 25, 2022

                              Respectfully submitted,

                              SHER TREMONTE LLP

                              By:  /s/ Theresa Trzaskoma
                                   Theresa Trzaskoma
                                   Noam Biale
                                   Cathy Liu
                                   90 Broad Street, 23rd Floor
                                   New York, NY 10004
                                   (212) 202-2600
                                   Ttrzaskoma@shertremonte.com

                                   *Attorneys for Appellant Flatiron*
                                   *Partners, LP*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Appellant Flatiron Partners, LP certifies pursuant to Federal Rule of Appellate Procedure 32(g)(1) that the foregoing brief contains 4,237 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the Word Count feature on Microsoft Word; and that the brief has been prepared in 14-point Times New Roman font.

Dated:       New York, New York
             March 25, 2022

                                              /s/ Noam Biale
                                              Noam Biale